432 So.2d 936 (1983)
Robert D. WINSTON, Jr.
v.
BOURGEOIS, BENNETT, THOKEY AND HICKEY, Certified Public Accountants.
No. CA-0489.
Court of Appeal of Louisiana, Fourth Circuit.
May 16, 1983.
Rehearing Denied June 24, 1983.
*937 Bernard Marcus, Howard J. Ettinger, Deutsch, Kerrigan & Stiles, New Orleans, for plaintiff-appellee.
Moise W. Dennery, Donald H. McDaniel, McCloskey, Dennery, Page & Hennesy, New Orleans, for defendant-appellant.
Before SCHOTT, BARRY and KLEES, JJ.
PER CURIAM.
This appeal involves the application of a non-compete provision (LSA-R.S. 23:921) as it relates to a partnership agreement and a determination of what amounts are owed as a result of a partner's withdrawal.
Plaintiff, Robert D. Winston, was employed by defendant, Bourgeois, Bennett, Thokey & Hickey (BBTH), a public accounting firm, in May, 1970. In February, 1972 Winston became a C.P.A. and was admitted to practice law in October, 1975. On May 1, 1977 he was invited to become a partner in the firm, read and signed the partnership articles, and was assigned 21 "units" of participation. The firm consisted of twelve partners who owned varying amounts of units which totaled 589[1].
One year later on May 1, 1978, Daniel Clavier was admitted to the partnership, given 21 units, and guaranteed a $30,000 annual salary. Simultaneously, Winston's participation was increased to 23 units, along with adjustments to four other partners.
On September 30, 1978 Winston resigned from the partnership and sued BBTH for $8,178.38. He claimed $6,277.72 was due from his capital account, plus $1,900.66 representing his share of the partnership's profits for the quarter ending July 31, 1978 (based upon one quarter of $30,000 guaranteed per annum of which only $5,599.34 was actually paid). The firm reconvened claiming under Article II of the partnership agreement Winston owed $15,610.12 due to fees he received from former BBTH clients which he serviced within 18 months of his leaving. The parties stipulated BBTH owed Winston $6,277.72 from his capital account and $15,610.12 was the correct amount Winston owed the partnership if Article II[2] is legally enforceable. The $15,610.12 represents $8,092.20 for clients with BBTH for more than a year before Winston's withdrawal, and $7,517.92 for clients using the partnership for less than a year prior to Winston's leaving.
In written reasons the Trial Judge rejected Winston's $1,900.66 claim as unsupported. *938 He held that part of Article II upon which BBTH claims $8,092.20 amounts to liquidated damages designed to prevent solicitation which is prohibited under LSA-R.S. 23:921. However, BBTH was awarded the $7,517.92 claim based upon that portion of Article II being a restrictive covenant and not against public policy. The judgment awarded plaintiff the stipulated $6,277.72. Both parties have appealed.
Winston claims it was error to reject his $1,900.66 claim which he predicates on BBTH's $30,000 guarantee to Clavier (the newest partner). Winston argues since Clavier's compensation was based on 21 units of participation and his on 23 units, it was reasonable to believe both were entitled to $30,000 per year. James Thokey, a BBTH partner, testified a partner's income is calculated at the end of an accounting year and confirmed $30,000 was the minimum promised to Clavier, but it was payable annually, not quarterly. On cross-examination, Thokey agreed it was unrealistic for a partner with more units (Winston) to receive a smaller annual salary than a newer partner with less units. However, it was shown that the firm sought Clavier's services and his guarantee was negotiated due to another job offer. Also, there is no evidence that the actual income of Clavier exceeded Winston's. A guarantee is a minimum, not necessarily the actual amount paid. The record is insufficient for us to conclude that Winston was also guaranteed $30,000. Nor is there any basis to find that the $30,000 per annum meant that $7,500 was payable quarterly in advance. Winston did not carry his burden of proof, dismissal of this claim was reasonable and proper, and his appeal is without merit.
The next question, apparently res nova under these facts, is whether Article II of the partnership agreement comes within the purview of LSA-R.S. 23:921:
No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years.
Even though this statute refers only to an employer/employee, it has been judicially extended to various relationships which are "essentially" employer/employee.
For example, in Cust v. Item Co., 200 La. 515, 8 So.2d 361 (1942), the Supreme Court considered a non-compete agreement between two alleged partners. While the relationship "purported" to be a partnership, it was clear only one partner was bound by the non-compete proviso and the court concluded the clause was against public policy in violation of Act No. 133 of 1934 (predecessor of LSA-R.S. 23:921).
In Nelson v. Associated Branch Pilots of Port of Lake Charles, 63 So.2d 437 (La.App. 1st Cir.1953) an agreement between members of a pilots' association requiring withdrawing members to post bond (to assure no competition) was declared null and unenforceable as contrary to the public policy expressed in LSA-R.S. 23:921. The court found the Association had "control" over the member, and relying on Cust, stated at p. 439:
... Certainly, if the said act applies to such restrictions in contracts of partnership, the same would apply to the restriction contained in the agreement setting up the Association. In reality, the amount of control exercised over the members of the Association was greater than would be present in a partnership, *939 and the petitioner, with certain modifications, was no more than an employee of the Association. The By-Laws of the Association contained certain rules and regulations which are common to the employer and employee relationship.
Similarly, in McCray v. Cole, 259 La. 646, 251 So.2d 161 (1971) the Supreme Court declared null an agreement wherein a psychologist, in association with a group of psychiatrists, promised to pay $6,000 in liquidated damages should he withdraw and resume his practice in the same parish. The court held the "contract of employment violates the provisions of R.S. 23:921." It's important to note in Cole that only the psychologist was bound by the provision. However, the three psychiatrists had signed a separate contract that was examined by the 3d Circuit in McCray v. Blackburn, 236 So.2d 859 (La.App. 3d Cir.) writ denied, 256 La. 845, 239 So.2d 355 (1970). The court concluded that agreement did not violate R.S. 23:921 and declared "[t]he contract under consideration is not an employment contract. It is a partnership agreement which applied equally to all three partners ..., [and was] fair in all respects to all partners." Id. at 861. (Emphasis supplied.)
In Target Rental Towel, Inc. v. Byrd, 341 So.2d 600 (La.App. 2d Cir.1977) Byrd signed two agreements not to compete, one as an employee of the corporation and the other as a shareholder. Target contended that Byrd was not an employee within the meaning of the statute, but was a shareholder and partner with the other shareholders. The court disagreed, held both agreements unenforceable under LSA-R.S. 23:921, and said:
[Byrd's] status in the corporation, even as a one-third minority shareholder, was subject to the desire of the corporate board of directors, which of course was controlled by the two-thirds majority shares. The right of control and direction in the conventional sense of the employment relation is one of the most important tests in determining whether one is an employee. Whether the right is exercised is of much lesser importance. Simpson v. Kelly Services, Inc., 339 So.2d 490 (La.App. 2d Cir.1976), Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483 (1955). We agree with the trial court that Byrd was an employee within the context of R.S. 23:921. (Emphasis in original.)
The court noted the circumstances under which the agreements were executed:
Byrd did not participate in the creation of the corporation or induce others to invest in its venture. Byrd was the one induced by others to assume employment with Target and minority ownership of Target's shares in return for agreeing to work for the corporation. The circumstances of and consideration for Byrd's association with Target are not remotely similar to circumstances involving the sale or creation of a business where non-competition agreements have been enforced. See and compare Gold & Suckle [Inc. v. Suckle 335 So.2d 713 (La.App. 2d Cir.) writ refused 338 So.2d 700 (La. 1976)] and Mathieu v. Williams, 255 So.2d 151 (La.App. 2d Cir.1971).
Justice Tate, in Orkin Exterminating Co. v. Foti, 302 So.2d 593 (La.1974), emphasized the basis for our strong public policy against non-compete agreements:
The basic public policy of this state disfavors non-competition agreement[s] exacted of employees. The basic provision of La.R.S. 23:921 ... is a strict prohibition against any employer requiring such an agreement of his employee. Even before the 1934 statutory prohibition, the Louisiana courts had consistently held such agreements to be unenforceable. Cloverland Dairy Products Co. v. Grace, 180 La. 694, 157 So. 393 (1934); Blanchard v. Haber, 166 La. 1014, 118 So. 117 (1928). See: Comment, 33 La.L.Rev. 94 (1972); Note, 27 Tul.L.Rev. 364 (1953). In the absence of an enforceable contract to other effect, an employee has the absolute right to enter the employment of another and actively compete with his former employer. Jones v. Ernst & Ernst, 172 La. 406, 134 So. 375 (1931).
As noted in [National Motor Club of Louisiana, Inc. v.] Conque, 173 So.2d [238 *940 at] 241, the essential basis of these decisions "is the right of individual freedom and of individuals to better themselves in our free-enterprise society, where liberty of the individual is guaranteed. A strong public policy reason likewise for holding unenforceable an agreement exacted by an employer of an employee not to compete after the latter leaves his employment, is the disparity in bargaining power, under which an employee, fearful of losing his means of livelihood, cannot readily refuse to sign an agreement which, if enforceable, amounts to his contracting away his liberty to earn his livelihood in the field of his experience except by continuing in the employment of his present employer."
In summary, to determine the application of LSA-R.S. 23:921, numerous factors must be considered. The basic premise underlying the prohibition stems from the fundamental right of individuals to seek success in our free-enterprise society. The concept is to protect those whose job position creates a disparity in bargaining power between the parties. The form of the contract is immaterial as is the label tacked to the individual: employee, associate, partner, independent contractor, or shareholder. Pertinent inquiry includes whether all concerned are bound equally to the covenant; whether the terms are fair to each party in all respects; the amount of control over the individual; if the person is subject to the wishes of a controlling majority; the circumstances u nder which the contract was executed; the effect on the individual's right to engage freely in his occupation after the association terminates.
All parties to this partnership agreement are C.P.A.'sbusiness professionals. Winston worked as an associate with the firm for seven years before being offered the opportunity to join. During this time he passed the C.P.A. examination and was admitted to the Louisiana bar. When invited to become a partner, Winston was under no pressure to accept; to the contrary, this was obviously a step up the business ladder and meant more income plus prestige. It was also recognition of his ability and professional acceptance by his associates. He had the option to hang out his shingle or join another firm. If he had left the firm before joining the partnership, he was free to take its clients with him without having to share their fees. Of course, he could have declined the invitation to become a partner and continued with the firm as an employee. Instead, he voluntarily and without any hint of duress, opted to become a partner in order to secure the obvious benefits offered by this large, long-established firm. His partnership status surely provided him with a greater opportunity to meet and be accepted by the firm's clientsthe type of exposure which would take years to achieve as a sole practitioner.
This case parallels, to a large extent, McCray v. Blackburn, supra. We are convinced Winston was not an employee in any sense of the word. His vote was equal to his colleagues on essential matters. There is no evidence or indication that the firm exercised any control or direction over Winston's work. The agreement is not an employment contract, but rather a typical partnership pact. Article II, the alleged culprit, by its own terms applies equally to all partners. No majority controlled the firm's destiny, despite the necessity for the managing partners to handle the day-to-day activities. There was no disparity in bargaining power between the partners. This is, with due respect, a garden variety professional partnership contract which creates no control over anyone and is designed to protect all partners for their collective and individual best interests.
Winston was not estopped from pursuing his career nor was he prohibited from pirating his firm's clients. He was free to do what he didleave BBTH and take along some of the business, but he was obligated to compensate his former partners for a reasonable period of time and for a predictable sum. His committment to Article II was not extracted through any disparity in his bargaining power. Considering all of the above, we find LSA-R.S. 23:921 is not applicable to Article II of these articles of *941 partnership and Winston is therefore liable to the firm for the stipulated fees of $15,610.12.[3]
Winston claims the firm failed to advise persons calling for him that he had withdrawn from the partnership. The Trial Judge found the firm did not violate its fiduciary obligation to Winston and we find no manifest error in this factual conclusion.
ACCORDINGLY, the district court judgment in favor of Robert D. Winston for $6,277.72 is affirmed; the judgment in favor of Bourgeois, Bennett, Thokey & Hickey for $7,517.92 is amended and increased to $15,610.12. Each party to pay his own costs.
AFFIRMED IN PART; AMENDED IN PART.
NOTES
[1] Individual partners were assigned 99, 84, 84, 55, 55, 43, 36, 33, 33, 25, 21, 21. The partner with 99 units had 16.81% participation, while 21 units represented 3.57%.
[2] Article II: ... in the event of withdrawal from the firm of any partner, that partner shall be indebted to the firm for fifty percent (50%) of one year's fees earned from any and all clients of the firm at the time of withdrawal for whom he performs services customarily performed by CPA firms during a period of eighteen (18) months after the month of his withdrawal, except as may be approved by the firm.... "One year's fees" is hereby defined as the total fees earned from clients during the twelve months immediately preceding the date of any partner's withdrawal from the firm.

The next part of Article II defines "one year's fees": If any of such clients have not been serviced for a full year prior to a partner's withdrawal, then "one year's fees" is hereby defined as the total fees earned for the period ending twelve months following date of such withdrawal.
[3] In McCray, supra, the agreement's fairness was noted among the reasons for its enforcement. Under the facts in this case the agreement is likewise fair.