673 So.2d 248 (1996)
LOUISIANA SMOKED PRODUCTS, INC., Plaintiff-Appellant,
v.
SAVOIE SAUSAGE AND FOOD PRODUCTS, INC., Defendant-Appellee/Appellant.
No. 95-932.
Court of Appeal of Louisiana, Third Circuit.
March 27, 1996.
Rehearing Denied May 30, 1996.
*249 George Davidson Fagan, New Orleans, for Louisiana Smoked Products, Inc.
Alex L. Andrus, III, Opelousas, for Savoie Sausage and Food Products, Inc.
*250 Before DOUCET, C.J., and KNOLL, SAUNDERS, DECUIR and PETERS, JJ.
DOUCET, Chief Judge.
This case arises out of a contract between the parties, the termination of that contract and the subsequent conduct of the parties. Plaintiff, Louisiana Smoked Products, Inc. (L.S.P.), filed suit alleging breach of contract, unfair trade practices and other causes of action. Defendant, Savoie's Sausage and Food Products, Inc. (Savoie), denied all allegations and reconvened seeking $3,545.42, which Savoie claimed was due on an open account. Savoie also sought interest and attorney's fees in connection with the reconventional demand. A jury found in favor of defendant on all of plaintiff's demands. Based upon an admission by James Reynolds, the de facto owner of L.S.P., the trial judge granted defendant's reconventional demand, which had not been submitted to the jury (apparently because of the admission).
Savoie's reconventional demand forms no part of this appeal.
Subsequently, the trial judge denied plaintiff's motion for Judgment Notwithstanding The Verdict and Alternatively for New Trial. The trial judge granted plaintiff's motion to proceed in forma pauperis on appeal and its motion for a devolutive appeal. Plaintiff raises numerous issues on appeal. We find merit in one issue which requires us to review the case de novo. Therefore, we need not address the other issues.
Defendant also appeals, alleging the trial judge erred in granting plaintiff's motion to proceed, on appeal, in forma pauperis. We find no merit to this issue.
FACTS:
Savoie has a long history of manufacturing and distributing Cajun food products. In 1988, seeking to take advantage of a national increase in popularity of Cajun food, L.S.P. approached Savoie seeking to have Savoie manufacture some "private label" products for L.S.P. A second contract was entered in 1991. The 1991 contract, which was prepared by Savoie using the 1988 contract as a guide, contained the following clause:
3. (a)-This Agreement shall remain in effect until terminated by the parties as set forth herein. Written notice of termination shall be served by one party on the other party, at its business address, sixty (60) days prior to the effective date of the termination. Each party agrees and obligates itself not to engage in activity which directly competes with the other party's business activity for a period of three (3) years after the termination of this Agreement. [Emphasis ours.]
This clause, and its interpretation by the trial judge, forms the linchpin of this case.
This contract remained in effect until May 1993. During this period Savoie manufactured two commercially successful products for L.S.P.: smoked alligator sausage and smoked venison sausage. On May 5, 1993, Jim Reynolds, the owner of L.S.P., evidently called Freddie Lafleur, the General Manager of Savoie, to express his displeasure with the existing relationship. By a letter dated May 10, 1993, Mr. Lafleur agreed to terminate the contract between L.S.P. and Savoie stating, "I agree that it is best for us to end our relationship."
After termination of the contract, Savoie continued to manufacture and sell both smoked alligator sausage and smoked venison sausage under its own label. L.S.P. continued to market its own brands of those same products, now being manufactured for L.S.P. by Double D Meat, Inc. in Bogalusa, Louisiana.
LAW AND DISCUSSION
At some point following termination of the relationship between L.S.P. and Savoie, L.S.P. became insolvent and was forced to abandon business. In this suit, which followed, L.S.P. claims it was forced into insolvency by Savoie who, L.S.P. alleges, "stole" its business by soliciting L.S.P.'s customers and undercutting L.S.P.'s prices. Among other legal theories, L.S.P. claims that Savoie violated paragraph 3.(a). of the contract between the parties in that Savoie engaged in activities which directly competed with the other party's (L.S.P.'s) business activity within a three year period following termination of the contract between the parties.
*251 Savoie's defense to this claim is La.R.S. 23:921 which states, in pertinent part, that:
A. Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.
Several times, both before and during the trial, plaintiff attempted to have the trial judge rule that La.R.S. 23:921 was inapplicable to the case at bar. The trial judge refused plaintiff's requests and maintained that he intended to submit the question of § 921's applicability to the jury. The charges the trial judge gave to the jury indicate that this was done. In Laborde v. Velsicol Chemical Corp., 474 So.2d 1320, 1324 (La.App. 3 Cir.1985), writ denied, 480 So.2d 738 (La.1986) a panel of this court stated:
It is well-settled that adequate jury instructions are those which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues....
The adequacy of a jury instruction must be determined in light of the instructions as a whole....
If the court gives misleading, confusing instructions or omits an applicable essential legal principle, then such instructions do not adequately set forth the law and constitute reversible error.... The manifest error standard of appellate review may not be ignored unless the jury charges were so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts....
The `... standard of appellate review is that the mere discovery of an error in the trial judge's instructions does not itself justify the appellate court conducting a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case.' [Citations omitted; emphasis added.]
Further, it is well-settled that legal questions lie within the province of the court and that in a jury trial, the trial judge is mandated to instruct the jury on the correct principles of law applicable to the issues presented by the pleadings, the evidence and the testimony. Daigle v. Legendre, 619 So.2d 836 (La.App. 1 Cir.), writ denied, 625 So.2d 1040 (La.1993); Haydel v. Hercules Transport, Inc., 94-1246 (La.App. 1 Cir. 4/7/95), 654 So.2d 418.
Since the trial judge failed to properly instruct the jury on the law applicable to the case, it was impossible for the jury to apply the correct law to the facts of the case. Accordingly, we must conduct a de novo review of the case.
The first issue to be addressed is the applicability of La.R.S. 23:921 to the case at bar. In Sentilles v. Kwik-Kopy Corp., 94-1553, 2-4 (La.App. 4 Cir. 2/23/95), 652 So.2d 79, 81-82, the fourth circuit, with whom we agree, stated:
... In his reasons for judgment, the trial judge noted that Louisiana has a strong public policy against enforcement of non-competition agreements between employers and employees. This policy existed and was followed in caselaw before it was first codified in 1934, in La.R.S. 23:921. See Orkin Exterminating Co. v. Foti, 302 So.2d 593, 596 (La.1974). At the time Mr. Sentilles entered into the franchise agreement with Kwik-Kopy, the statute provided:
No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted [to] agree and bind himself that at the termination of his or her employment that *252 said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years.
La.R.S. 23:921 (prior to 1989 amendments). In 1989, the statute was amended. The new version retained the general prohibition of non-competition agreements, but delineated three specific exceptions: the sale of a business, the dissolution of a partnership, and any employer/employee agreement in which the restraint on competition is confined to specific parishes or municipalities and does not exceed two years from the date of termination of employment. In 1991, an exception was added which specifically permits non-competition agreements between the parties to a franchise as long as the duration of the non-competition period does not exceed two years from the severance of the franchise relationship. R.S. 23:921(E) (West 1994).
The trial judge concluded that the 1989 (and subsequent) amendments were not to be applied retroactively. He further concluded that according to Winston v. Bourgeois, Bennett, Thokey & Hickey, 432 So.2d 936 (La.App. 4th Cir.1983), R.S. 23:921 is applicable to "business relationships other than strictly personal employer/employee" relationships. See Reasons for Judgment. Finally, the trial court held that because non-competition clause in the franchise agreement offended the public policy of Louisiana at the time it was signed, Louisiana law must be applied to invalidate the non-competition provision.
After reviewing the law and the facts, we conclude that the trial court's decision to apply Louisiana law was in error. The public policy of Louisiana, both prior to 1934 and later, as expressed in R.S. 23:921, has always been to prohibit (or severely restrict) non-competition agreements between employers and employees. In Winston, supra, which was cited by the trial court as support for its decision, we considered whether to apply the prohibition of R.S. 23:921 to invalidate the non-competition provision of a partnership agreement. We first noted that: "Even though this statute refers only to an employer/employee, it has been judicially extended to various relationships which are `essentially' employer/employee." 432 So.2d at 938. After reviewing the jurisprudence, we stated:
In summary, to determine the application of LSA-R.S. 23:921, numerous factors must be considered. The basic premise underlying the prohibition stems from the fundamental right of individuals to seek success in our free-enterprise society. The concept is to protect those whose job position creates a disparity in bargaining power between the parties. The form of the contract is immaterial as is the label tacked to the individual: employee, associate, partner, independent contractor, or shareholder. Pertinent inquiry includes whether all concerned are bound equally to the covenant; whether the terms are fair to each party in all respects; the amount of control over the individual; if the person is subject to the wishes of a controlling majority; the circumstances under which the contract was executed; the effect on the individual's right to engage freely in his occupation after the association terminates.
Id., at p. 940.
We then examined the relationship of the partners according to this criteria and concluded that it was not essentially an employer/employee relationship, and therefore the non-competition provision was valid. Id. at 940-941.
The Winston decision did nothing to alter Louisiana's longstanding public policy that non-competition agreements in employer/employee relationships are disfavored. However, in order for that policy to apply, the relationship, when examined, must be "essentially" an employer/employee relationship, regardless of what it is named in the contract.
Upon examination, it is clear that no employer/employee, partnership/partner, corporation/shareholder or franchise/franchisee relationship existed between Savoie and L.S.P. Rather, they were two independent corporations, on almost equal footing, dealing *253 with one another at arm's length. Each had much to gain if, during the life of the contract, L.S.P.'s business was successful. Likewise, each stood to lose potential profits if L.S.P.'s venture failed. Neither business had any managerial control over the other, and the only compensation paid by Savoie to L.S.P. was in the form of "royalties" on the small amount of L.S.P. product sold by Savoie directly to L.S.P.'s customers with L.S.P.'s permission. Likewise, the only compensation paid to Savoie by L.S.P. was for sausage manufactured and packaged. Accordingly, it is clear that La.R.S. 23:921 is not applicable to the case at bar.
Legal agreements have effect of law upon the parties, and as they bind themselves parties shall be held to a full performance on obligations flowing therefrom.... A party to a contract has an implied obligation to put forth a good faith effort to fulfill the conditions of the contract....
The courts are bound to enforce the contract as written.... Words of a contract must be given their generally prevailing meaning.... Any unclear and ambiguous contract term must be interpreted against the party who prepared the contract....
The burden of proof in an action for breach of contract is on the party claiming rights under the contract. The existence of the contract and its terms must be proven by a preponderance of the evidence.... [citations omitted.]
Bond v. Allemand, 632 So.2d 326, 328-329 (La.App. 1 Cir.1993), writ denied, 94-718 (La. 4/29/94), 637 So.2d 468.
Furthermore, "It is not within the province of the courts to relieve parties of their bad bargains." Board of Commissioners of Port of New Orleans v. Turner Marine Bulk, Inc., 629 So.2d 1278, 1282 (La.App. 4 Cir.1993), writ denied, 634 So.2d 392 (La.1994), citing Kenny v. Oak Builders, Inc., 256 La. 85, 235 So.2d 386, 390 (1970).
Since there is nothing illegal or against public policy in the contract, the contract must be applied according to the intent of the parties. The contract is simple and straightforward. The parties agreed, among other things, "... not to engage in activity which directly competes with the other party's business activity for a period of three (3) years after the termination of this Agreement." Savoie did not abide by this portion of the covenant. Therefore, Savoie must pay damages for this breach of contract.
Much evidence was introduced and much testimony adduced on the issue of damages. It is well established that the proper measure of lost profits is net loss. Our courts, while recognizing that lost profits may not always be susceptible of proof to a mathematical certainty, have held that lost profits must nonetheless be proven with reasonable certainty, that is, by a preponderance of the evidence. An award of damages for lost profits cannot be based on either conjecture nor speculation. See Graham v. Edwards, 614 So.2d 811 (La.App. 2 Cir.), writ denied, 619 So.2d 547 (La.1993); and Clark v. Ark-La-Tex Auction, Inc., 593 So.2d 870 (La.App. 2 Cir.), writ denied, 596 So.2d 210 (La.1992).
Much of plaintiff's proof of lost profits was based upon speculation and anticipated increases in sales. However, the record contains some definite amounts, including the amounts of both alligator and venison sausages Savoie sold, in pounds, to persons other than L.S.P. from the termination of the contract, May 5, 1993 through December 31, 1993, and like figures from January 1, 1994 to October 31, 1994, approximately one month prior to the beginning of the trial of the matter on December 5, 1994. If Savoie sold "X" number of pounds of a product to a customer who otherwise would have bought from L.S.P., then L.S.P. lost the sale of those "X" number of pounds of sausage.
Further, it was the uncontroverted testimony of James Reynolds, L.S.P.'s owner, that he (L.S.P.) made $1.11 per pound profit on alligator sausage and $1.41 per pound profit on venison sausage. Receipts filed into evidence establish that L.S.P. paid on average $1.10 per pound for alligator meat (L.S.P. paid only $0.75 per pound for alligator scraps, but up to $2.06 per pound for alligator meat). Batch and formula sheets show that each pound of raw alligator yielded *254 4.09 pounds of alligator sausage (60 pounds of alligator plus pork and other ingredients add up to 252.85 pounds total batch weight; that weight gave a 97% yield of sausage for a net total of 245.26 pounds of product). Thus each pound of sausage contained $0.27 worth of alligator, giving L.S.P. a net profit of $0.84 on each pound of alligator sausage sold.
The only prices for venison we could find were on an invoice to Savoie from a California firm dated June 22, 1993, for 240 pounds of venison at $1.60 per pound and $1.02 per pound, on a Savoie batch sheet dated August 27, 1993. This is an average of $1.31 per pound. The venison sausage and batch sheets show 50 pounds of venison yielded 245.51 pounds of venison sausage. This calculated to $0.27 worth of venison in each pound of venison sausage or a net profit to L.S.P. of $1.14 per pound sold.
Our examination of the record reveals that Mr. Reynolds defined his profit as the difference between what Savoie charged him for the finished and packaged product and the price Reynolds/L.S.P. charged his "jobber" or his largest customer, McCarthy-Holman. This, then, would be "gross" profit.
The proper measure of damages is net loss or gross profit minus expenses. See Edwards, 614 So.2d 811. Thus, the foregoing figures show L.S.P.'s loss of "net" profits (. "gross" profits minus costs), or L.S.P.'s net loss, to be as follows:

 Alligator Sausage
May 5-Dec. 31, 1993-2,199.93 lbs. × $0.84/lb...................$ 1,847.94
Jan. 1-Oct. 31, 1994-16,384.40 lbs. × $0.84/lb.................$13,762.90
Nov. 1, 1994-May 5, 1996-29,765.54 lbs. × $0.84/lb.............$25,003.05*
* Based upon sales between Jan. and Oct. 1994.
 SUB-TOTAL....$40,613.89
 Venison Sausage
May 5-Dec. 31, 1993-1,478.59 lbs. × $1.14/lb...................$ 1,685.92
Jan. 1-Oct. 31, 1994-3,572.90 lbs. × $1.14/lb..................$ 4,073.11
Nov. 1, 1994-May 5, 1996-6,490.89 lbs. × $1.14/lb..............$ 7,399.61*
* Also based upon sales between Jan. and Oct. 1994.
 SUB-TOTAL....$13,158.64
TOTAL DAMAGES DUE L.S.P..........................................................$53,772.53

All other claims by appellant, Louisiana Smoked Products, are denied.
We find no error in the trial court's decision to allow L.S.P. to proceed in forma pauperis. It is true that pauper status is not usually granted to corporations. However, this court in Joiner v. Chelette, 377 So.2d 521 (La.App. 3 Cir.1979), held that an individual, who is in fact the owner of a business, proceeding under the trade name of his business should, if circumstances warrant, be allowed the privilege of proceeding in forma pauperis. See also Jolivette v. Jolivette, 386 So.2d 707 (La.App. 3 Cir.1980).

CONCLUSION
Accordingly, the judgment of the trial court denying the demand of Louisiana Smoked Products against Savoie's Sausage and Food Products, Inc. is reversed. Judgment is entered in favor of Louisiana Smoked Products, Inc. and against Savoie's Sausage and Food Products, Inc. in the amount of fifty-three thousand, seven hundred seventy-two and 53/100 dollars ($53,772.53), plus interest from the date of judicial demand until paid. No interest shall be due on that portion of the damages which has not yet accrued at the time of payment. All costs, both at the trial level and on appeal, are assessed against defendant, Savoie's Sausage and Food Products, Inc.
REVERSED AND RENDERED.
KNOLL and SAUNDERS, JJ., dissent and assign written reasons.
*255 KNOLL, Judge, dissenting.
I agree that the improper jury instruction requires a de novo review in this case; however, I disagree with the majority opinion because in my view, La.R.S. 23:921 does apply to the case sub judice. The majority view commits an error of law. The language of the statute is quite clear. It states:

Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.
La.R.S. 23:921(A) (emphasis added).
The statute then provides for a few limited exceptions to this rule. The case sub judice does not fall within any of the exceptions. Therefore, La.R.S. 23:921 should apply and the non-competition clause should be given no effect.
The majority opinion holds that La.R.S. 23:921 applies only to employer-employee type relationships. This is incorrect. I think the majority is referring to La.R.S. 23:921 as it existed prior to its amendment which became effective in June, 1990. The statute as amended requires broader application than the pre-amendment statute. Before being amended in 1989, La.R.S. 23:921 read as follows:
No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree and bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged over the same route or in the same territory for a period of two years.
The pre-amendment statute by its own terms applied only to employers and employees. Nevertheless, the pre-amendment jurisprudence extended the statute's prohibition of non-competition clauses to other relationships that were essentially employer-employee. Examples included independent contractors, partners, or shareholders where there was a great difference in bargaining power. Admittedly, the statute as it read in 1989 would not apply to the case sub judice. The plain language of the amended statute, however, now demands its application to the case sub judice.
The majority opinion cites Sentilles v. Kwik-Kopy Corp., 94-1533 (La.App. 4 Cir. 2/23/95), 652 So.2d 79, writ denied, 95-2178 (La. 11/17/95), 663 So.2d 713, in support of its argument. Sentilles dealt with a contract executed in 1986, and, therefore, La.R.S. 23:921 as it existed before the 1989 amendment applied. The case sub judice involves a 1991 contract, and the broader amended version of La.R.S. 23:921 is controlling.
L.S.P.'s a rubrica argument that La.R.S. 23:921 is inapplicable since it is found in a part of the revised statutes dealing with employment issues is unpersuasive. This is especially so in light of La.R.S. 23:921's exceptions for sale of a business, dissolution of a partnership, and franchise agreements. These exceptions plainly illustrate that La. R.S. 23:921 applies to relationships other than employer-employee type relationships.
For these reasons I respectfully dissent.
SAUNDERS, Judge, dissenting.
I agree with the majority's finding that this case does not involve an employer/employee, partnership/partner, corporation/shareholder, or franchise/franchisee relationship. These are the exceptions contained in La.R.S. 23:921(B), (C), (D) and (E), which sections provide for circumstances under which a non-competitive clause in a contract may be valid.
While not discussed by the majority, it is also clear that section (F), dealing with computer *256 programming, is not applicable to the present case.
La.R.S. 23:921(A) reads as follows:
(A) Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.
As I read this section, it is preemptive. It covers every possible type of contract which restrains persons from exercising a lawful business. Some restraint of trade is permissible and Sections (B) through (F) provide for this limited restraint of trade. The majority has concluded, as do I, that none of these exceptions are applicable. Under La.R.S. 23:921, all other contracts in restraints of trade or business are null and void. Ergo, since the contract we are dealing with is not covered by any of the exceptions, it is null and void.
The majority, after determining that none of the exceptions to La.R.S. 23:921 are applicable, proceeds to determine "that La.R.S. 23:921 was inapplicable to the case at bar." This is where we differ. I read La.R.S. 23:921 as covering all contracts in restraint of trade.
In the present case, the contract is clearly not covered by any of the exceptions and, therefore, is null and void. Indeed, if the contract in the present case is not null and void, it becomes most difficult, if not impossible, to envision any contract in restraint of trade which would be prohibited.
For the foregoing reasons, I respectfully dissent.