751 So.2d 278 (1999)
BONCOSKY SERVICES, INC. and C. & C. Logistics, Inc.
v.
Sam LAMPO, John L. Majors and Quality Transport, Inc.
No. 98 CA 2239.
Court of Appeal of Louisiana, First Circuit.
November 5, 1999.
Rehearing Denied December 30, 1999.
Writ Denied March 24, 2000.
*280 Felix R. Weill, Baton Rouge, for Plaintiffs/Appellees, Boncosky Services, Inc. and C. & C. Logistics, Inc.
James R. Lewis, Baton Rouge, for Defendants/Appellants, Quality Transport, Inc., Sam Lampo and John L. Majors.
Before: CARTER, C.J., LeBLANC, and PETTIGREW, JJ.
CARTER, C.J.
This is an appeal from a judgment finding that Sam Lampo, John Majors, and Quality Transport violated the Louisiana Unfair Trade Practices Act (LUTPA), LSA-R.S. 51:1401 et seq., and awarding damages in the amount of $150,000.00 to the plaintiffs, Boncosky Services Inc. and C & C Logistics, Inc. The plaintiffs answered the appeal seeking an increase in the amount of damages to $1,396,671.00.

*281 FACTS AND PROCEDURAL HISTORY
Sam Lampo and John Majors were employed by C & C Transport, Inc. (C & C Transport), a liquid petroleum transportation company owned by John Mangano. Lampo had been employed by C & C Transport since 1982, and Majors had been employed by C & C Transport since 1987. Since approximately 1992, Mangano entrusted the daily operation of the business to Lampo and Majors. Lampo oversaw sales, personnel, and general operations, and reported to Mangano, while Majors served as operations manager and reported to Lampo. At no time did Lampo or Majors ever sign an employment contract or non-competition agreement with C & C Transport.
In the summer of 1995, Boncosky Services, Inc. (Boncosky Services), a national transporter of chemical products, was interested in establishing a presence in the Baton Rouge area. Robert C. Boncosky, the president of Boncosky Services, contacted Mangano and arranged an initial meeting with him in Baton Rouge. Boncosky's interest in a possible purchase of C & C Transport increased, and he made another visit to Baton Rouge in the early part of 1996. At that time, Boncosky was provided with a equipment list of C & C Transport and introduced to Lampo and Majors.
Eventually, Mangano and Boncosky agreed to an arrangement where Boncoksy Services would purchase the assets of C & C Transport. Once the assets were purchased, Boncosky Services would then lease these assets back to a newly formed, subsidiary company, C & C Logistics, which would service the same customers that C & C Transport had serviced. This agreement was not a buy-out of the shares of C & C Transport, but only a transfer of assets.
Boncosky sent a letter of intent dated August 5, 1996, to Mangano, specifying the terms of the purchase of assets. On August 8, 1996, Pete Denil and Roger Czajkowski, the respective general manager and financial comptroller of Boncosky Services, arrived in Baton Rouge to perform the financial due diligence prior to the sale of the company. During the visit, Lampo and Majors, who had become concerned about their future with the new company, asked Denil whether they could get employment contracts to ease their concerns. Although Denil indicated that was something Boncosky Services would investigate, he later decided employment contracts would not be provided to Lampo or Majors.
In the early part of October, Denil and John Boncosky, Boncosky Services' Director of Sales, contacted Lampo and Majors to set up meetings with key customers of C & C Transport in an effort to ease the transition. Again, Lampo and Majors voiced their concerns over the lack of information they and the rest of the employees of C & C Transport had regarding their future with the company. According to Lampo, as late as October 7, no one from Boncosky Services had been there to discuss their employment and roles with the new company. Lampo and Majors had a lot of anxiety regarding their futures and feared they would be replaced after the sale of assets, which was scheduled to be completed on October 31.
A purchase agreement, which included all the provisions of the letter of intent, was executed on October 9, 1996, by Boncosky Services and C & C Transport. The agreement provided that Boncosky would buy nearly all of C & C Transport's assets for $1.8 million. As a general condition to closing, the purchase agreement provided that contracts would be in place for key employees.[1] According to the testimony of Robert C. Boncosky, Lampo and Majors *282 were the most important part of the sale because they were the management team and would be expected to expand the existing customer base of C & C Transport. Another condition of closing provided that C & C Transport, through Mangano, and Mangano individually, would execute a two-year non-competition agreement. Lampo and Majors were not parties to this agreement, nor the act of sale.
When Denil was in Baton Rouge from October 8-10, 1996, to meet with the customers, he also met with Lampo and Majors to discuss their roles with the new company. According to Lampo and Majors, once the sale of assets was completed, their duties, authorities, and responsibilities would be greatly diminished; they would not be entitled to any retirement benefits from Boncosky Services; and there would be significant changes to their use of company cars. Majors also testified that he was told that his salary was in the higher range for his position. Once again, they requested employment contracts, but their request was denied. When Lampo and Majors considered the changes that the sale of assets would bring, and the tone of the meeting with Denil, their fears of becoming buy-out casualties reached a pinnacle.
Following the October 8 meeting with Denil, Lampo and Majors both pondered their futures. Their options included accepting employment in different fields, staying with the company, or starting their own business. In mid-October, Lampo began to gather information on forming his own trucking company. He went to see Russell Dennis at Capitol Trucks, Inc. to discuss truck information. At that meeting, Lampo indicated he was still unsure what he was going to do, but gave Dennis the necessary information so he could contact Mercedes Benz to determine whether Capitol Trucks could arrange for financing for Lampo's potential purchase of trucks. Capitol ordered trucks on October 21, 1996. Lampo eventually purchased trucks from Capitol in the first week of December, after his financing was approved. According to Dennis, Lampo was never obligated to buy the tracks until their arrival in the first week of December.
Lampo also met with Bob Jackson, the owner of Slades Industrial Services (Slades), a tank sales and repair business in Baton Rouge. Slades was also a representative of the Jack Olsta Company, a dealer of tank trailers. Lampo discovered it would take sixty to ninety days to obtain trailers through Slades. Slades had ordered stock trailers on October 17, 1996, and Lampo eventually purchased 5 of those trailers in the early part of December. Jackson indicated that the Heil Company, which received the trailer order, required a customer name to be on every order; however, Jackson indicated this did not obligate Lampo and Majors to purchase these particular trailers since the trailers were ordered as a stock order.
On October 11, 1996, Lampo and Majors encountered William Clark, the district manager for Associates Commercial Corporation (Associates Commercial), at a restaurant in Baton Rouge. Associates Commercial financed trucks and trailers. According to Clark, Lampo and Majors told him they were exploring their options and asked if Associates Commercial would look at the possibility of being a source of financing if they decided to form their own business. Clark had credit applications with him and gave them to Lampo and Majors to fill out so Associates Commercial could be in a better position to evaluate them as credit risks. However, before the financing was approved, Majors notified Associates Commercial that he would not be part of Lampo's proposed new company.
On October 14, 1996, Lampo met with William Sidler, of Associates Commercial, and provided him with a completed credit application, a personal financial statement, and a pro forma income statement, which reflected Lampo's estimation of revenue and expenses for his proposed company. Included on the pro forma income statement *283 was the estimated revenue of freight business for several companies that were then customers of C & C Transport. However, Lampo testified that at the time he listed these companies on the pro forma income statement, he had not spoken with any of their representatives about obtaining their business. He only listed these companies because he thought his new company would be able to service them in the early stages of operation.
About this same time, Lampo also contacted Charles Trent, an insurance agent in Lafayette. Lampo indicated he was considering starting his own trucking business and asked Trent to check on availability and pricing for worker's compensation and liability insurance. Lampo provided Trent with information necessary to obtain a quote and eventually purchased insurance for his new business through Trent on December 1, 1996. Included in the information Lampo provided was a tentative list of drivers, a description of the company, and the location of its customers. Trent testified that he took the speculative information from Lampo and presented it to the insurance companies in order to give the most complete picture of the business so that the insurers could give a better estimate of the insurance costs.
The act of sale was scheduled to be completed on October 31, 1996, in Baton Rouge. In the act of sale between C & C Transport and Boncosky Services, Mangano represented that he knew of no reason why C & C Transport's customers would not continue to do business with the purchaser (Boncosky Services) after closing the transaction. However, C & C Transport did not have any exclusive provider contracts with its customers.
Lampo had been directed by Mangano to attend a training seminar put on by Boncosky Services on October 30, 1996, at its home office in Lake in the Hills, Illinois. On the evening of October 30, 1996, Lampo was confronted by Denil regarding a rumor that he had heard indicating Lampo was going into business with Kimball Oil. Lampo denied the rumor.
After Lampo denied the rumor, Denil then presented him with an employment contract containing a non-competition agreement and asked Lampo to sign it. Lampo declined to sign the contract at that time, but indicated he would be going to work for the new company, C & C Logistics. Upon his return to Baton Rouge, Lampo decided he did not like the way he had been treated by Boncosky Services and decided he was not going to work for the new company. On November 1, 1996, Lampo faxed a letter to Denil informing him that he was not going to accept employment with the new company. On the morning of November 4, 1996, Lampo told all the C & C Logistics employees he would not be working for the new company and left the premises.[2]
On that same day, Denil arrived in Baton Rouge to establish communication with the customers after Boncosky Services' purchase of assets. Although Majors had accepted employment with the new company,[3] he informed Denil that he was still considering other alternatives, and there was a probability he would not be staying. On November 22, 1996, Majors tendered his resignation to be effective on December 8, 1996; however, Boncosky Services terminated Majors' employment on December 4, 1996.
On December 2, 1996, C & C Logistics received notice from Steve Geneva, the transportation manager of Diamond Shamrock, one of C & C Logistics' biggest customers, that indicated Diamond Shamrock would no longer need the services of C & C Logistics. On December 9, 1996, Lampo's new company, Quality Transport, began hauling products for Diamond *284 Shamrock. All of the drivers employed by Quality Transport had previously worked for C & C Logistics. However, none of the drivers had an employment contract or non-competition agreement with C & C Logistics.
On December 10, 1996, Boncosky Services and C & C Logistics filed a petition for damages naming Lampo, Majors, and Quality Transport as defendants. The plaintiffs alleged that the defendants violated the LUTPA and the Louisiana Trade Secrets Act. LSA-R.S. 51:1431 et seq. The plaintiffs further alleged that Lampo and Majors breached their fiduciary duties owed to C & C Transport and C & C Logistics. On February 5, 1997, the plaintiffs amended their petition to include an allegation that the defendants intentionally interfered with the contract between Boncosky Services and C & C Transport and its owner, John Mangano.
This matter was tried before a jury on January 6-10, 1998. The jury found that Lampo, Majors, and Quality Transport had engaged in unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade and commerce and awarded the plaintiffs $150,000.00 in damages. Pursuant to that verdict the trial judge signed a judgment reflecting the verdict and awarded the plaintiffs $160,000.00 in attorney's fees, $31,000.00 as fees for the plaintiffs' expert witness, and $16,000.00 as costs.
The defendants appeal the judgment of the trial court alleging the jury committed manifest error in finding Lampo, Majors and Quality Transport violated the LUTPA; that the trial court improperly instructed the jury; and that the trial court erred in awarding attorney's fees and costs to the plaintiffs. The plaintiffs answered the appeal seeking to increase the amount of damages to $1,396,671.00.

DISCUSSION

Jury Instructions
In this case, we must first determine whether the defendants properly preserved their objection to the jury charges. Louisiana Code of Civil Procedure article 1793 paragraphs A. through C. outline the procedure by which objections to the proposed jury instructions are to be made and provides as follows:
A. At the close of the evidence, or at such earlier time as the court reasonably directs, a party may file written requests that the court instruct the jury on the law as set forth in the requests.
B. The court shall inform the parties of its proposed action on the written requests and shall also inform the parties of the instructions it intends to give to the jury at the close of the evidence within a reasonable time prior to their arguments to the jury.
C. A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.
This provision creates a mandatory rule for preserving an objection to a trial court's ruling regarding requested jury instructions. In order to preserve the right to appeal a trial court's refusal to give a requested instruction or its giving of an erroneous instruction, a party must not only make a timely objection, but must state the grounds of his objection. Merely making an objection, without assigning any reasons therefor, is insufficient. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, p. 37 (La.App. 1st Cir.3/11/94), 634 So.2d 466, 489, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094.
The record reflects the defendants made a general objection that the jury instruction did not include any cases interpreting the LUTPA or the codal article on *285 fraud. Defendants then provided a specific objection to the trial court's failure to give their jury charges on the basis that the facts presented required the particular principles of law reflected in their charges be presented to the jury. After reviewing the transcript of the charge conference, we find the objection by defendants was sufficient to preserve their right to appeal the trial court's refusal to give their proposed charges.
The defendants contend that the trial court committed an error of law by failing to instruct and charge the jury as to what constituted unfair and/or deceptive methods of competition under Louisiana law and jurisprudence, especially as to the requisite intent required to find a violation of the LUTPA.
Louisiana Code of Civil Procedure article 1792 addresses jury charges and provides as follows:
A. At any time during the trial, the court may instruct the jury on the law applicable to any issue in the case.
B. After the trial of the case and the presentation of all the evidence and arguments, the court shall instruct the jurors on the law applicable to the cause submitted to them. The court shall reduce such instructions to writing. The court shall further instruct the jury that it may take with it or have sent to it a written copy of all instructions and charges and any object or document received in evidence when a physical examination thereof is required to enable the jury to reach its verdict.
C. This charge shall be in writing and available to the parties and to jurors in their deliberations.
In a jury trial, the judge has a duty to charge the jury as to the law applicable in a case and the correlative right and responsibility to require that the jury get only the correct law. It is the judge's responsibility to reduce the possibility of confusing the jury, and he may exercise the right to decide what law is applicable to prevent counsel from arguing law which the trial judge deems inappropriate. The judge is not required to give the precise instruction submitted by either party, but must give instructions which properly reflect the law applicable in light of the facts of the particular case. Belle Pass Terminal, Inc., 634 So.2d at 488.
A charge to the jury, even if it correctly states the law, must be based on evidence adduced in the case. A trial judge is not required to give a charge unless the facts support the giving of the charge. Belle Pass Terminal, Inc., 634 So.2d at 488. A trial judge is mandated to instruct the jury on the correct principles of law applicable to the issues presented by the pleadings, the evidence and the testimony. Louisiana Smoked Products, Inc. v. Savoie Sausage and Food Products, Inc., 95-932, p. 4 (La.App. 3rd Cir.3/27/96), 673 So.2d 248, 251, affirmed on other grounds, 96-1716 (La.7/1/97), 696 So.2d 1373.
Adequate instructions are those instructions which fairly and reasonably point up the issues presented by the pleadings and evidence and which provide correct principles of law for the jury's application thereto. The adequacy of jury instructions must be determined in light of the jury instructions as a whole. Belle Pass Terminal, Inc., 634 So.2d at 488.
An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. The standard of review required of this court in determining whether an erroneous jury instruction has been given requires a comparison of the degree of error with the jury instructions as a whole and the circumstances of the case. Belle Pass Terminal, Inc., 634 So.2d at 488-89.
If the improper charges contributed to the verdict, no weight should be given to that portion of the verdict. In such instance, the appellate court must make an independent review of the record *286 in order to determine which party should prevail on that issue by a preponderance of the evidence. Belle Pass Terminal, Inc., 634 So.2d at 489.
Having found that the defendants properly preserved their objection to the jury charges, we must determine whether the trial court gave an erroneous instruction. In her instructions, the trial court stated:
The unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.
Under the Consumer Protection Act, consumer means any person who uses, purchases or leases goods or services. Person means a natural person, a corporation, trust, partnership, incorporated or unincorporated association and any other legal entity. The Louisiana Unfair Trade Practices and Consumer Act provides that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. Now, to determine what constitutes unlawful competition or trade practices must be decided on a case by case basis. Conduct is deemed unlawful if it involves fraud, misrepresentation, deception, breach of a fiduciary duty or other unethical conduct. Practice is considered unfair for purposes of Unfair Practices Act when it offends established public policy and when practice is unethical, oppressive, unscrupulous or substantially injurious to consumers including business competitors.
Further, the law provides that fraud is a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause loss or inconvenience to the other. Fraud may also result from silence of [sic] inaction.
Violations of the LUTPA are decided on a case by case basis; however, there is an abundance of jurisprudence that must be considered by a fact finder that explains the respective rights of each party when an employee enters into competition against his former employer and what, if any, duties that employee has to disclose such information to his former employer.
Although the instructions given by the trial court are an accurate statement of the law, there were facts presented at trial regarding issues raised by the plaintiffs that required more precise charges to be given. Plaintiffs argue the defendants violated the LUTPA because they solicited and stole customers with the specific intent to harm the plaintiffs' business; made fraudulent misrepresentations regarding whether Lampo was staying and maintaining customer relations on behalf of the new company; and that Majors assisted Quality Transport at plaintiffs' expense by hiring and training unneeded drivers who ultimately went to work for Quality Transport. The defendants presented specific charges on these areas of law that can be summarized as follows.
In the absence of a contrary agreement, an employee is free to compete with his former employer. Orkin Exterminating Company v. Foti, 302 So.2d 593, 596 (La.1974). Competition and free enterprise are favored. As long as conduct is neither unlawful nor offensive to public policy, persons are able to discuss changes of employment, effectuate a change of employment, plan to compete and take preliminary steps in furtherance of that plan. United Group of National Paper Distributors, Inc. v. Vinson, 27,739, p. 16 (La.App. 2nd Cir.1/25/96), 666 So.2d 1338, 1348, writ denied, 96-0714 (La.9/27/96), 679 So.2d 1358.
In order to determine what constitutes unfair competition involves a balancing between the right of the employee to individual freedom on one hand and the right of the employer to honest and fair competition and the protection of business assets and property in the nature of trade secrets on the other hand. National Oil Service of Louisiana, Inc. v. Brown, 381 So.2d 1269, 1273 (La.App. 4th Cir.1980). *287 Solicitation of customers after the end of an employment relationship does not form the basis for a claim of unfair competition. Ahmed v. Bogalusa Kidney Care Center, 560 So.2d 485, 489-90 (La.App. 1st Cir.), writ denied, 564 So.2d 324 (La.1990).
A former employee who enters business in competition with his former employer necessarily utilizes the experience he acquired and the skills he developed while in a former employment. While the employer may by contract obtain limited protection from former employees, by law he may be entitled to protection against wrongful appropriation and use by former employees of things specially developed by the employer in his business, such as lists of customers (particularly route sales) whose regular patronage has been acquired by the employer's advertising, solicitation and organized effort. Considerations as to the type of protection to be afforded to the employer in a specific case include the manner in which and the purpose for which customer lists are compiled; the conduct and motivation of the employee before and after termination and the nature of the representations made to the customer by the former employee; and the existence of a scheme to take over all or a substantial part of the former employer's business, or of an intent to injure the former employer's business. National Oil Service, 381 So.2d at 1273. A critical factor is a defendant's motivation; the actions must have been taken with the specific purpose of harming the competition. Conduct does not violate the LUTPA unless it is undertaken with the specific intent to harm the competition. United Group, 666 So.2d at 1346.
In order to find fraud from silence or suppression of the truth, there must exist a duty to speak or disclose information. Greene v. Gulf Coast Bank, 593 So.2d 630, 632 (La.1992). An employee is duty bound not to act in antagonism or opposition to the interest of the employer. Every one, whether designated agent, trustee, or what not, who is under contract or other legal obligation to represent or act for another in any particular business or line of business must be loyal and faithful to the interest of such other in respect to such business or purpose. Realty Mart, Inc. v. Greenwell Commercial Properties, Inc., 343 So.2d 459, 461 (La.App. 1st Cir.), writ denied, 345 So.2d 902 (La.1977).
In the present case, the trial court offered no jury instruction on the issues of customer solicitation, duty of disclosure, or the intent required to violate the LUTPA. Because of the lack of instruction on these issues, the jury was not adequately informed of the applicable legal principles to apply to the facts of the case. As a result, the verdict rendered by the jury is tainted, and we must conduct a de novo review.

Solicitation of Customers
Plaintiffs accuse Lampo of "secretly scheming" to steal customers of C & C Transport. In support of this, plaintiffs point to the pro forma income statement Lampo submitted with his credit application, a memo prepared by Russell Dennis in anticipation of securing truck sales, and the insurance application prepared by Charles Trent. Plaintiffs argue these documents evidence Lampo's solicitation of C & C Transport's customers because they were all written prior to the act of sale and prior to Lampo's resignation.
The pro forma income statement was submitted by Lampo to Sidler on October 14, 1996. The statement was an estimation of revenue and expenses for Lampo's proposed trucking business. Lampo submitted this statement to Sidler in order to give Associates Commercial an idea of the expected profitability of his proposed business. Lampo was seeking financing through Associates Commercial. Although the pro forma income statement listed Diamond Shamrock, Kimball Oil, and Ewings of Innis, as potential customers, it did not secure a customer relationship between them and Lampo's new company. The pro forma income statement supplied figures *288 for the estimated revenue his company could earn from these accounts. These figures were based on Lampo's personal experience from handling these accounts. Lampo's unrefuted testimony revealed that he never discussed his proposed business with these customers prior to listing them on the pro forma income statement.
The record indicates that in late October of 1996, before Lampo notified Boncosky that he was not going to work for C & C Logistics, he spoke with Steve Geneva, the transportation manager of Diamond Shamrock. Lampo had known Geneva for seven or eight years. Lampo explained that things he had been promised with the new company were not shaping up and there was a possibility he would be starting his own company. Lampo inquired if Geneva would be willing to speak with him about the new company when the time came, and Geneva said he would.
At another meeting in late October between Lampo, Majors, H.M. Kimball and Johnny Ewing, Lampo inquired of Kimball whether they would be interested in talking about the possibility of going with a new trucking company if a new trucking company were to emerge. Kimball was in charge of Kimball Oil, and Ewing was a partial owner of Ewings of Innis, both customers of C & C Transport. Kimball responded that he would be willing to talk, but made no commitment.
After our review of the record, we do not find Lampo's actions constituted improper solicitation of customers. Initially, we note Lampo was never bound by any type of non-competition agreement with his employer, C & C Transport, the purchaser of assets, Boncosky Services, or its subsidiary, C & C Logistics. In the absence of such agreement, Lampo was free to form a competing business. See National Oil Service, 381 So.2d at 1272. Secondly, the documents that plaintiffs claim evidence a scheme by Lampo to steal their customers is actually evidence of Lampo's preliminary steps to start his own business. Lampo testified he was never sure he would actually start his own business until he received notice his financing was approved on November 4, 1996. Because Lampo was never an actual employee of Boncosky Services nor C & C Logistics, and our policy favors free enterprise, we find Lampo was clearly entitled to take such preliminary steps in furtherance of his plan to start his own company while he worked for C & C Transport. See United Group, 666 So.2d at 1348.
Neither these documents nor the meetings with the representatives of Diamond Shamrock, Kimball Oil, and Ewings of Innis secured any customer relationship between Lampo's business and these companies. The record indicates that the trucking business is a highly competitive business with customers sometimes frequently changing carriers to obtain better service. Given that, we find it implausible that Lampo could secure business from any customer before he had established lines of credit, equipment, or drivers. Thus, there is no evidence to support plaintiffs' contention that Lampo schemed to destroy their business by stealing clients because plaintiffs did not prove any solicitation took place prior to Lampo's departure.
Moreover, plaintiffs did not produce any customer of C & C Transport or C & C Logistics who testified they were solicited by Lampo for his new business while he was working for C & C Transport. Nor did they offer any evidence that Lampo or Majors had steered customers away from C & C Logistics, or given customers a negative impression of the service that would be provided by C & C Logistics. Absent a showing that the list of customers of C & C Transport was built through advertising, solicitation, or organized effort on the part of C & C Transport, we decline to prohibit Lampo from utilizing the experience he had, which experience includes his relationships with customer representatives, in establishing his own company. Because there was no evidence that the customer list of C & C Transport was *289 specially developed by Lampo's employer, under the circumstances of this case, we find Lampo was free to use all his experience and skills he developed while working for C & C Transport in building his own company.[4]
We also find there is no evidence to prove Lampo was taking key employees of C & C Transport to his new company. Although Lampo may have envisioned employees of C & C Transport working for his company, the plaintiffs did not present any evidence that any employees had actually been contacted by Lampo regarding working for his company before he left on November 4, 1996. To the contrary, every former employee of C & C Transport and C & C Logistics who testified at trial indicated that Lampo did not approach them about working for his new company until after he had resigned from C & C Transport. Although Majors initially considered forming his own company as Lampo's partner, he decided to stay with C & C Logistics and did not make his decision to leave until November 21, 1996. Certainly, Lampo is entitled to utilize his contacts with potential drivers and coworkers to establish and build his own business once he was no longer employed by C & C Transport.

Fraudulent Misrepresentations
Plaintiffs claim Lampo's assurances that he was staying to work for the new company, C & C Logistics, "induced" Boncosky Services into buying the assets of C & C Transport, and that Lampo fraudulently assured Robert C. Boncosky that he was maintaining customer relations.
The record indicates conflicting testimony regarding whether Lampo actually told Robert C. Boncosky he was staying with the new company or whether he allowed Boncoksy to assume he was staying while he explored his employment options. Thus, we must determine whether Lampo was under any duty or obligation to inform Boncosky that he was starting his own company.
Although some correspondence in the record identifies Lampo was the vice-president of C & C Transport, Mangano testified Lampo was never a true corporate officer because he did not want anyone to have the liabilities associated with being a corporate officer, nor was Lampo ever listed as a corporate officer of C & C Transport with the Secretary of State. Lampo was never under any employment contract with C & C Transport, C & C Logistics, or Boncosky Services. Given the absence of any employment contract or corporate title, we find Lampo had no duty to inform Boncoksy Services of his intentions to start a new company.
Contained in the purchase agreement was a provision providing that contracts for key employees would be in place as a condition of closing the sale. According to the testimony of Robert C. Boncosky, Lampo and Majors were both considered key employees because of their management experience. Lampo was unaware of this provision, but requested an employment contract on several occasions out of fear that he would lose his job when Boncosky Services took over the business. Lampo was offered a contract on the eve of the closing and only after representatives of Boncoksy Services heard a rumor that he might be leaving to form his own business.
Boncosky Services was aware that Lampo wanted an employment contract, but refused to offer him one until the eve of the closing. Lampo's refusal was not an obstacle to the closing in spite of the provision in the letter of intent that contracts for key employees would be in place prior to closing. Robert C. Boncosky testified that he had decided not to exercise that condition at his own discretion. Yet, Robert C. Boncosky testified that Lampo was a key employee because of his management experience and customer relations. *290 Under this scenario, we cannot say Lampo's actions were an inducement for Boncosky Services' purchase of assets.
We find that Boncosky Services' contention that Lampo fraudulently induced them into the sale of assets is more accurately characterized as "sour grapes." Boncosky knew Lampo was not an owner of C & C Transport, that he was not bound by the non-competition agreement contained in the act of sale and that he was not an officer of C & C Transport. Lampo was merely an at-will employee. Because he was not an officer of C & C Transport, nor was he under any employment contract with the plaintiffs, Lampo was under no duty to disclose his plans for forming a competing business.

Actions of Majors
Plaintiffs assert Majors assisted Quality Transport at their expense by allegedly hiring two unneeded drivers and training them at C & C Logistics' expense when the drivers were ultimately going to work for Quality Transport. Majors hired Joe Narcisse on November 1, and Scott Richard on November 15. These two men along with the other seven drivers employed by C & C Logistics all went to work for Quality Transport on December 9, 1996.
Majors testified Narcisse and Richard were hired because the drivers in the Lafayette area were exceeding or very close to exceeding the limit of hours they could work in a certain time period set by the Department of Transportation. Although this was disputed by Robert C. Boncosky and Ricky Thibodeaux, a dispatcher for C & C Logistics, Majors contended that the log books supported the need. He further explained that he had been notified that the owner of one of the trucks C & C Logistics leased in Lafayette was filing bankruptcy, which would leave C & C Logistics short one truck and two drivers that would have to be replaced. Accordingly, there is support for the hiring of the two drivers.
The plaintiffs never called Narcisse or Richard to testify regarding when they agreed to go to work for Quality Transport after being trained at C & C Logistics' expense. Nor did the plaintiffs produce any evidence that there was contact between Lampo and Majors concerning the training of these two drivers and their ultimate employment with Quality Transport. We note none of the drivers of C & C Logistics were under employment contracts or non-competition agreements. According to Mangano, the drivers were free to change jobs at any time and often did. We find the plaintiffs did not prove that Majors hired these two drivers with any intention of taking advantage of C & C Logistics.

CONCLUSION
Based on our de novo review of the record, we find the plaintiffs did not prove that Sam Lampo, John Majors or Quality Transport violated the LUTPA in any manner. The judgment of the trial court is hereby reversed with all costs of the appeal to be assessed against the plaintiffs, Boncosky Services and C & C Logistics. Although we do not find merit to plaintiffs case, we also do not find that the suit was brought in bad faith as for purposes of harassment. Therefore we deny defendants' claim for attorney's fees.
REVERSED.
NOTES
[1] At no time were Lampo and Majors aware of the provision that key employees would have contracts in place prior to closing.
[2] Lampo was paid by C & C Logistics for the period of November 1 to November 4, but Lampo returned the check.
[3] Majors' employment with C & C Logistics was not secured by an employment contract.
[4] This court is aware that Lampo was never an employee of C & C Logistics or Boncosky Services and that his former employer, C & C Transport, is not a party to this action.