CHARLES N. BRANTON
v.
CHRISTOPHER DAVID FOX.
No. 2006 CA 1353.
Court of Appeal of Louisiana, First Circuit.
November 21, 2007.
NOT DESIGNATED FOR PUBLICATION.
JAMES G. WYLY, III, THEAR J. LEMOINE, Phelps Dunbar, LLP, Attorneys for Plaintiff/Defendants in Reconvention/Cross-Appellants/Appellees Charles N. Branton and The Coregis Group.
CHARLES N. BRANTON, Plaintiff/Appellant, In Proper Person[1]
FREDERICK S. ELLIS, WILLIAM J. DUTEL, Dutel & Tranchina, L.L.C. Attorneys for Defendant/Plaintiff-in-Reconvention/Appellee/Appellant, Dr. Christopher David Fox.
Before PARRO, GUIDRY, AND McCLENDON, JJ.
PARRO, J.
Both Dr. Christopher David Fox and his former attorney, Charles N. Branton, appeal the judgments that dismissed Dr. Fox's legal malpractice and fraud claims against Branton, denied Branton's claims on open account for attorney fees and costs from Dr. Fox, and ordered Branton to pay a portion of Dr. Fox's legal fees in this litigation.[2] We affirm the judgment in part. We also reverse in part and render.

BACKGROUND
Dr. Fox hired Branton in 1995 to handle his community property partition and some other matters incidental to his divorce. Dr. Fox's divorce, child custody, and support issues had been resolved through prior counsel. Branton represented him for the next two years in that litigation, during which time Dr. Fox paid him $70,000 in attorney fees. Branton withdrew as Dr. Fox's counsel in August 1997, and Dr. Fox retained other counsel. Branton then filed this suit on open account against Dr. Fox in September 1997 for unpaid attorney fees and costs. Dr. Fox reconvened with legal malpractice claims. In a supplemental reconventional demand, Dr. Fox added The Coregis Group, Branton's professional liability insurance carrier, as an additional defendant-in-reconvention.
In his reconventional demand, Dr. Fox alleged that Branton had improperly advised him to prepay alimony to his ex-wife, resulting in a potential tax liability,[3] and that Branton had incorrectly told him to pay legal interest on the community property equalizing payment from the date of judicial demand, rather than from the date of judgment, resulting in a gross overpayment of interest. As discovery in this suit progressed, Branton produced two letters, dated March 3 and March 13, 1997, in which the legal interest issues were explained to Dr. Fox. Branton claimed he hand-delivered these letters to Dr. Fox. Dr. Fox claimed he never received this correspondence and amended his reconventional demand to include claims of fraud for Branton's alleged backdating of these letters in aid of his defense. Dr. Fox also contended that Branton had advised him to pay the community property settlement in full satisfaction of the judgment, without any reservation of rights, while allowing his ex-wife to reserve her right to appeal the valuation of Dr. Fox's medical practice. Dr. Fox also contended there were excessive charges, duplications, and inaccuracies in Branton's billings.
After a trial in this matter, the court took the matter under advisement and, in January 2001, issued eighteen pages of written reasons for judgment. The court found Dr. Fox had failed to carry his burden of proof on his reconventional demands and dismissed his malpractice and fraud claims on the basis that Dr. Fox had not established that he had suffered any losses due to Branton's actions or inactions. The court also found that Branton had failed to prove his entitlement to the unpaid attorney fees that were the subject of the suit on open account, denied his claim, and ordered him to pay Dr. Fox the pro-rated portion of attorney fees and court costs that Dr. Fox had incurred defending Branton's claim on the open account. However, these amounts were not determined or fixed in the judgment, which was signed on January 26, 2001.
Branton then filed a motion to recuse the presiding judge, Reginald T. Badeaux, III, which was granted after a hearing before another judge. The case was re-allotted to Judge Larry J. Green. Both parties filed motions for a new trial, which were denied. Branton's writ application to this court was denied, and both parties then appealed the judgment on the merits. This court dismissed that appeal for lack of subject matter jurisdiction; the judgment was not final because there were outstanding issues to be decided. After a hearing on these remaining issues, the trial court awarded Dr. Fox $4500 in attorney fees for defending the suit on open account and ordered each party to be responsible for its own court costs. A judgment incorporating these rulings was signed on June 23, 2005, and this appeal by both parties followed.
In this appeal, Dr. Fox alleges the trial court erred by applying "a higher burden of proof" to the facts and evidence at trial; by finding that Dr. Fox had failed to meet that burden of proof; and by failing to award Dr. Fox more attorney fees for the defense of Branton's suit on open account. He claims legal error and asks this court to conduct a de novo review of the evidence. Dr. Fox also asks this court to affirm the denial of Branton's claims on open account for unpaid attorney fees and costs.
Branton assigns as error the court's failure to award him fees and expenses for work he performed while representing Dr. Fox. Branton alleges that although the court recognized that Dr. Fox had sustained no monetary losses as a result of Branton's representation of him, the court then ignored that fact and also failed to recognize that Branton had achieved favorable results for Dr. Fox in the community property settlement, entitling him to the balance of his attorney fees and costs owed by Dr. Fox. Branton also assigns as error the court's award of attorney fees to Dr. Fox for defending the claim on open account. Branton contends there is no statute justifying such an award of attorney fees. Therefore, it was legal error for the trial court to expand the pleadings and make a "loser pays" award of attorney fees.

APPLICABLE LAW

Suit on Open Account
Under Louisiana law, attorney fees are not allowed except where authorized by statute or contract. Whiddon v. Livingston Parish Council, 04-1126 (La. App. 1st Cir. 5/6/05), 915 So.2d 863, 866. Louisiana Revised Statute 9:2781, governing suits on open account, provides for an award of attorney fees under certain circumstances. The relevant portions of that statute at the time this suit was filed were as follows:
A. When any person fails to pay an open account within fifteen days after receipt of written demand therefor correctly setting forth the amount owed, that person shall be liable to the claimant for reasonable attorney fees for the prosecution and collection of such claim when judgment on the claim is rendered in favor of the claimant.
* * *
C. For the purposes of this Section and Code of Civil Procedure Articles 1702 and 4916, "open account" includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions. "Open account" shall include debts incurred for professional services, including, but not limited to, legal and medical services. (Footnote omitted).
Thus, an "open account" is an account in which a line of credit is running and is open to future modification because of expectations of prospective business dealings and services are recurrently granted over a period of time. Signlite, Inc. v. Northshore Serv. Ctr., Inc., 05-2444 (La. App. 1st Cir. 2/9/07), 959 So.2d 904, 907.
In proving an open account, the plaintiff must first prove the account by showing that the record of the account was kept in the course of business and by introducing supporting testimony regarding its accuracy. Once a prima facie case has been established by the plaintiff-creditor, the burden shifts to the debtor to prove the inaccuracy of the account or to prove that the debtor is entitled to certain credits. The amount of an account is a question of fact which may not be disturbed absent manifest error. Deutsch, Kerrigan & Stiles v. Fagan, 95-0811 (La. App. 1st Cir. 12/15/95), 665 So.2d 1316, 1320, writ denied, 96-0194 (La. 3/15/96), 669 So.2d 418; Jacobs Chiropractic Clinic v. Holloway, 589 So.2d 31, 34 (La. App. 1st Cir. 1991).

Legal Malpractice
To establish a prima facie case for legal malpractice, a plaintiff must prove there was an attorney-client relationship, the attorney was guilty of negligence in his handling of the client's case or professional impropriety in his relationship with the client, and the attorney's misconduct caused the client some loss or damage. Sherwin-Williams Co. v. First Louisiana Const., Inc., 04-0133 (La. App. 1st Cir. 5/6/05), 915 So.2d 841, 844. When an attorney's performance falls below the standard of competence and expertise usually exercised by other attorneys in handling such matters, the attorney is liable for any damage to the client caused by his substandard performance. Ault v. Bradley, 564 So.2d 374, 379 (La. App. 1st Cir.), writ denied, 569 So.2d 967 (La. 1990); Sherwin-Williams, 915 So.2d at 845.
The proper method to assess whether an attorney's malpractice is a cause in fact of damage to his client is determining whether the correct performance of that act would have prevented the damage. Prestage v. Clark, 97-0524 (La. App. 1st Cir. 12/28/98), 723 So.2d 1086, 1091, writ denied, 99-0234 (La. 3/26/99), 739 So.2d 800. The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm not yet realized does not suffice to create liability for a delictual action. Braud v. New England Ins. Co., 576 So.2d 466, 468 (La. 1991). The damage suffered must at least be actual and appreciable in qualitythat is, determinable and not merely speculative. Harvey v. Dixie Graphics, Inc., 593 So.2d 351, 354 (La. 1992).

Fraud
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. LSA-C.C. art. 1953. Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence. LSA-C.C. art. 1957. Fraud cannot be predicated on mistake or negligence, no matter how gross. Fraudulent intent, which constitutes the intent to deceive, is a necessary element of fraud. Whitehead v. American Coachworks, Inc., 02-0027 (La. App. 1st Cir. 12/20/02), 837 So.2d 678, 682; Cortes v. Lynch, 02-1498 (La. App. 1st Cir. 5/9/03), 846 So.2d 945, 950.
Intent to defraud and loss or damage are two essential elements of legal fraud. McDonough Marine Serv., a Div. of Marmac Corp. v. Doucet, 95-2087 (La. App. 1st Cir. 6/28/96), 694 So.2d 305, 309. The trial court's findings with respect to a claim of fraud are subject to the manifest error standard of review. Boudreaux v. Jeff, 03-1932 (La. App. 1st Cir. 9/17/04), 884 So.2d 665, 672; Victorian v. American Deposit Ins. Co., 04-0852 (La. App. 1st Cir. 9/23/05), 923 So.2d 650, 655.

Standard of Review
The appellate court's review of factual findings is governed by the manifest error-clearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court; and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993). When factual findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact's findings, for only the fact finder can be aware of the variations in demeanor and tone that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989).
With regard to questions of law, the appellate review is simply a review of whether the trial court was legally correct or legally incorrect. Hidalgo v. Wilson Certified Exp., Inc., 94-1322 (La. App. 1st Cir. 5/14/96), 676 So.2d 114, 116. On legal issues, the appellate court gives no special weight to the findings of the trial court, but exercises its constitutional duty to review questions of law and render judgment on the record. In re Mashburn Marital Trust, 04-1678 (La. App. 1st Cir. 12/29/05), 924 So.2d 242, 246, writ denied, 06-1034 (La. 9/22/06), 937 So.2d 384.

ANALYSIS

Suit on Open Account
This litigation commenced with Branton's suit on open account against his former client, Dr. Fox. The record shows that Branton sent Dr. Fox written demand and an invoice for payment of legal fees and costs in the amount of $12,585.74. Dr. Fox acknowledged at trial that he did not pay this bill and that Branton had done legal work for him during the time period represented in this invoice. However, the invoice had numerous errors that were pointed out to Branton during the trial. Most of these were entries billing $40 per hour for work done by his legal secretary, Sharlene Kelley, which were not items included in the fee schedule to which Dr. Fox had agreed. Ms. Kelley said Branton had told her to bill that amount for her time; Branton said he did not tell her to bill her time and did not notice these entries when the final bill was sent. After making deductions at trial for those and other errors, Branton stated the total due from Dr. Fox on this final bill was only $7,807.94. Branton did not seek to collect additional attorney fees under LSA-R.S. 9:2781 for the prosecution and collection of his claim.
The court made no factual findings concerning whether any amount of attorney fees had or had not been established by the evidence produced by both parties. However, the court did find that Dr. Fox had failed to meet his burden of proof that Branton had double billed him and other clients. Yet the court disallowed the entirety of Branton's invoice, stating that: (1) as Dr. Fox's mandatary under LSA-C.C. arts. 2989[4] and 3001,[5] Branton owed him prudent and diligent billing as an imperative part of representing his interests, and (2) Branton's imprudent billing practices put his entire bill in question, resulting in a bill "so convoluted with errors that the only fair and equitable thing to do is to relieve [Dr. Fox] of the entire bill." The court reasoned that by his haphazard billing practices, Branton breached his duty as mandatary to diligently represent his client, and ordered that his entire bill be "relinquished."
We conclude that this decision was legal error. An action for legal malpractice normally states a cause of action in tort. Gifford v. New England Reinsurance Corp., 488 So.2d 736, 738 (La. App. 2nd Cir. 1986). To establish liability under the general negligence principles of LSA-C.C. art. 2315, a plaintiff must prove five separate elements, one of which is that the plaintiff was damaged. Boland v. West Feliciana Parish Police Jury, 03-1297 (La. App. 1st Cir. 6/25/04), 878 So.2d 808, 815, writ denied, 04-2286 (La. 11/24/04), 888 So.2d 231. Because a legal malpractice claim is a particular kind of tort claim, in order to recover, the plaintiff must prove that the attorney's misconduct caused some loss or damage to the client. See Schwehm v. Jones, 03-0109 (La. App. 1st Cir. 2/23/04), 872 So.2d 1140, 1144. The damage suffered must be actual and appreciable in quality  that is, determinable and not merely speculative. Harvey, 593 So.2d at 354. Louisiana Civil Code article 3001, concerning the duties of a mandatary, also clearly states that the mandatary is responsible to the principal for the loss that the principal sustains as a result of his failure to perform. Unquestionably, Dr. Fox established that Branton's final bill was inaccurate. However, he acknowledged that Branton had done additional legal work for him in the community property litigation during the time period represented by that billing, thereby admitting that some amount may be due for those services. He also admitted that he had been very pleased with the outcome of the community property partition, because the court ordered him to pay less than half of the amount his ex-wife was claiming. Although Dr. Fox's legal expert, Robert C. Lowe, challenged the necessity for some of the entries in Branton's previous bills, he did not point out specific amounts that would offset the balance due for Branton's services. Any other billing problems or errors remained speculative and the amounts were not determinable from the evidence. Therefore, even if Branton breached his duty as mandatary for Dr. Fox by imprudence and lack of diligence in his billing practices, Dr. Fox did not establish that he was damaged by such excessive or inaccurate billings, except as to the errors pointed out in the final invoice.[6] Those errors were corrected during trial, leaving an uncontested balance of $7,807.94. Because Dr. Fox did not prove he was damaged by Branton's billing practices, the court erred in ordering that Branton's remaining balance was to be "relinquished" for breach of his duties as a mandatary for Dr. Fox. Therefore, we will reverse that portion of the judgment denying any recovery on the open account and will render judgment ordering Dr. Fox to pay Branton the unpaid attorney fees and costs in the amount of $7,807.94, plus legal interest from date of judicial demand.

Legal Malpractice/Fraud
The crux of this case concerns Dr. Fox's allegations of legal malpractice and fraud against Branton. We will not attempt to reproduce a summary of the evidence on both sides of this issue, since this is more than adequately described in the trial court's written reasons for judgment, which are attached as Appendix A. Suffice it to say that there was some evidence upon which the trial court could conclude that Dr. Fox, Branton, and various other witnesses lacked credibility concerning certain of their claims and defenses. Ultimately, after reviewing all of the evidence put forward by both sides, the trial court concluded that "assuming arguendo" that Branton had failed to give his client the correct advice concerning prepayment of alimony and payment of legal interest on the community property settlement judgment, and had fraudulently tried to manufacture a defense by backdating some letters concerning those issues, Dr. Fox had not proven that Branton's misconduct caused him any damage. As the trial court stated, "If there is no damage the alleged misconduct would be irrelevant."
With reference to the prepayment of alimony, Dr. Fox used the total pre-paid amount as a deduction on his 1995 income tax return. Although that was not a valid deduction and subjected him to possible penalties from the IRS, the IRS did not penalize him for that deduction, and the three-year period in which such penalties could have been imposed had passed. Therefore, as the trial court noted, Dr. Fox actually "won the tax lottery" and received a gain, rather than a loss, as a result of that error. Dr. Fox's expert economist, Dr. Roger Burford, testified concerning the "loss of use" value of the amount of alimony that Dr. Fox pre-paid, using the interest earned on certain mutual funds to compute the interest income that could have been earned over time, even though the principal would decrease each month if those alimony payments were paid monthly. On cross-examination, he acknowledged that Dr. Fox would have had to pay income taxes at his rate of about 39.6% on the additional interest income, which would have significantly reduced the amounts he could have made by investing the money. And if lower-yielding investments were made for any reason, those calculations of the value of the "loss of use" or "loss of investment opportunity" would have had still lower amounts.
With reference to Branton's advice concerning calculation of legal interest on the community property partition equalizing payment paid by Dr. Fox, there was conflict in the circuit courts concerning whether such interest was due from date of judicial demand or from date of judgment. Therefore, the trial court stated that Branton "should not be held liable for an error of judgment when the judiciary itself is in disagreement over the same issue." The trial court further found that the testimony of Dr. Burford concerning the overpayment of interest did not establish that Dr. Fox could actually have invested the funds in a way that would have provided him with a certain amount of interest income over time. The court stated that "[i]n the final analysis, Mr. Burford's assessment was that [Dr. Fox] suffered a loss of an opportunity to invest." Since the calculations on loss of an opportunity to invest were speculative and had not been proven to a reasonable certainty, the trial court concluded that Dr. Fox had failed to establish a determinable amount of damages.
Had this court been sitting as the trier of fact in this case, we might have assigned greater weight to Dr. Burford's testimony. However, a trial court may accept or reject in whole or in part the opinion expressed by any expert. Rao v. Rao, 05-0059 (La. App. 1st Or. 11/4/05), 927 So.2d 356, 365, writ denied, 05-2435 (La. 3/24/06), 925 So.2d 1232. The effect and weight to be given expert testimony is within the broad discretion of the trial court. Fishbein v. State ex rel. LSU Health Sciences Ctr., 06-0549 (La. App. 1st Cir. 3/9/07), 960 So.2d 67, 73, writs denied, 07-0730 and 0708 (La. 6/22/07), 959 So.2d 495 and 505. Further, the rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Rao, 927 So.2d at 365. Therefore, even if this court might have evaluated the testimony of the various expert and fact witnesses differently than the trial court did in this case, we must defer to the trial court's broad discretion.
We also find no reason to believe that the trial court applied an incorrect burden of proof to Dr. Fox in this case. The court stated repeatedly that the evidence on most of the issues did not predominate in favor of one party or another. Concerning the fact that Branton did not properly advise his client on the legal interest issue, the court stated, "Whether or not [Dr. Fox] was advised of the split in the circuits is an irresolvable issue." About Branton's allegedly fraudulent preparation of two letters to bolster his defense, the court stated:
Given the Court's diligent attentiveness to all testimony, it is hard pressed to state with certainty that it believes [Branton]. It is equally hard pressed to find that [Dr. Fox] proved by a preponderance that [Branton] did in fact fraudulently generate letters ... to [Dr. Fox].
At another point, the trial court concluded that "... this case is so close as to be a tie." Obviously, if a case is a tie, the party bringing the claim has not established it by a preponderance of the evidence. It is clear from a full reading of the trial court's written reasons that the preponderance of the evidence standard was applied to the claims made by Dr. Fox. Finding no legal error in the trial court's application of the burden of proof, we have reviewed the trial court's factual findings using the manifest error standard.
Based on our review of the record, we find that there was evidentiary support for the factual findings of the trial court on the issues of legal malpractice and fraud. Since many of those factual findings were based on determinations regarding the credibility of witnesses, we are required to give great deference to the trier of fact's findings. Moreover, the record as a whole does not show that those findings were manifestly erroneous. Therefore, we affirm the judgment dismissing Dr. Fox's reconventional demands based on legal malpractice and fraud.

Attorney Fees
Branton challenges the court's award to Dr. Fox of his pro-rata portion of attorney fees for having to defend against Branton's suit on open account; Dr. Fox seeks an increase in this award. We find merit in Branton's argument on this issue. Under Louisiana law, attorney fees are not allowed except where authorized by statute or contract. Whiddon, 915 So.2d at 866. The trial court did not cite any statutory authority for such an award, Dr. Fox did not point out any legal basis for it, nor has our research disclosed any statute or contract by which such an award was authorized under the circumstances of this case. Therefore, we reverse the portion of the judgment ordering Branton to pay Dr. Fox $4500 in attorney fees for defending the suit on open account.

CONCLUSION
Based on our review of the record and judgments in this case, we reverse the portion of the judgment dated January 26, 2001, ordering Branton to pay to Dr. Fox the pro-rata portion of attorney fees attributable to defending Branton's suit on open account, as well as the portion of the judgment dated June 23, 2005, awarding Dr. Fox $4500 for such attorney fees. In all other respects, the June 23, 2005 judgment is affirmed. We also reverse the portion of the January 26, 2001 judgment that denied recovery by Branton on his suit on open account, and we render judgment, ordering Dr. Fox to pay Branton $7,807.94, plus legal interest from the date of judicial demand. In all other respects, the January 26, 2001 judgment is affirmed. Each party is to bear its own costs for this appeal.
JUDGMENT OF JUNE 23, 2005, REVERSED IN PART AND AFFIRMED IN PART. JUDGMENT OF JANUARY 26, 2001, REVERSED IN PART, RENDERED IN PART, AND AFFIRMED IN PART.

APPENDIX A
 22ND JUDICIAL DISTRICT COURT FOR TILE PARISH OF ST. TAMMANY
 STATE OF LOUISIANA
 NUMBER: 97-14134 DIVISION "I"
 CHARLES N. BRANTON
 VERSUS
 CHRISTOPHER DAVID FOX
 FILED: ____________________________________________________
 DEPUTY CLERK

REASONS FOR JUDGMENT

FACTS
This matter came for trial on the 13th, 14th, 15th and 21st of December, 2000 before the Honorable Reginald T. Badeaux The matter was then taken under advisement. After having reviewed the evidence and memoranda, the Court assigns the following Reasons to the Judgment which is attached hereto and rendered in connection herewith.
On September 10, 1997 Charles N. Branton ("Plaintiff") filed suit against his former client, Christopher David Pox ("Defendant") on an open account pursuant to La. R.S. 2781 alleging that the Defendant did not pay the balance of the Plaintiffs attorney fees in the amount of $12,585.74. The Defendant filed a reconventional demand in which he alleged malpractice for the Plaintiffs negligent handling of the Defendant's community property partition. More specifically, The Defendant alleged that he was not informed by the Plaintiff that there was a spilt in the circuits as to when interest began tolling in community property settlements. The Defendant also alleged that he was not given the choice as to whether the Defendant should elect to oppose Judge Watts's ruling that he was to pay interest on the community property settlement from date of judicial demand. Furthermore, the Defendant stated that he was ill-advised by the Plaintiff to pre-pay his alimony.
The Defendant alleged the Plaintiff fraudulently generated 2 letters which were introduced into evidence as, Fox 7 dated March 3, 1997 ("Fox 7") and Fox 9 dated March 12, 1997 ("Fox 9"). The Defendant alleged the Plaintiff generated these letters, backdated them and lied about hand delivering (hen to the Defendant's office. Defendant alleged Mat these letters were produced as discovery progressed. The Defendant further alleged that when the Plaintiff realized he had a potential malpractice exposure, he fraudulently generated the letters and manufactured a story that he delivered the letters to the Defendant's office to cover up his negligence. The Defendant also averred that the Plaintiff fraudulently charged him for time he did not actually work. The Defendant complained the Plaintiffs bills were replete with errors.' The Defendant claimed he was double billed, billed for the Plaintiff's secretary's time and billed for time which in fact the Plaintiff did not work.

FINDINGS OF FACT
On March 6, 1995, the Plaintiff, via an engagement letter, was retained by the Defendant to represent the Defendant in his pending partition proceedings and on certain visitations issues and other actions incidental to his divorce. Prior to the Defendant retaining the Plaintiff, a divorce had been obtained and child custody and support issues had been resolved through prior counsel. Plaintiff represented Defendant for the next twenty-six months. The Fox v. Fox matter was pending in Judge France Watts's Division of The Twenty-Second Judicial District Court, During that period, Judge Watts was terminally ill with cancer.
Mr. D. Douglas Howard, Esq., testified that he was the Defendant's attorney preceding the Plaintiff. Mr. Howard was ordered by the Court to testify. The stated that he sent the Defendant an engagement letter regarding his hourly rates, which stated that he began charging at.25 hours, and charged legal interest if payment was overdue. Howard testified that the Defendant accused him of transferring the Defendant's signature on documents which he filed without obtaining the Defendant's approval. Mr. Howard commented that this accusation was outrageous.
Howard stated that be withdrew representation of the Defendant due to the Defendant's express dissatisfaction. Howard stated that he collected his fees after he sent a letter requesting lees pursuant to La. R. S. 9:2781. He further testified that when the Plaintiff commenced his representation of the Defendant, Howard sent the entire file to the Plaintiff and kept a photocopy for himself. He stated that he does not usually withhold correspondence,
At trial, Plaintiff, Defendant and Mary Grace Knapp, Attorney for Defendant's wife, testified that the Domestic case was voluminous and highly contentious. Knapp confirmed that there were many emergency orders to which the Plaintiff had to respond. Knapp also testified

APPENDIX A
 22ND JUDICIAL DISTRICT COURT FOR TILE PARISH OF ST. TAMMANY
 STATE OF LOUISIANA
 NUMBER: 97-14134 DIVISION "I"
 CHARLES N. BRANTON
 VERSUS
 CHRISTOPHER DAVID FOX
 FILED: ____________________________________________________
 DEPUTY CLERK

REASONS FOR JUDGMENT

FACTS
This matter came for trial on the 13th, 14th and 21st of December, 2000 before the Honorable Reginald T. Badeaux Ill. The matter was then taken under advisement. After having reviewed the evidence and memoranda, the Court assigns the following Reasons to the Judgment which is attached hereto and rendered in connection herewith.
On September 10, 1997 Charles N. Branton ("Plaintiff") filed suit against his former client, Christopher David Fox ("Defendant") on an open account pursuant to La. R.S. 2781 alleging that the Defendant did not pay the balance of the Plaintiffs attorney fees in the amount of $12,585.74. The Defendant filed a reconventional demand in which he alleged malpractice for the Plaintiff's negligent handling of the Defendant's community property partition. More specifically, The Defendant alleged that he was not informed by the Plaintiff that there was a split in the circuits as to when interest began tolling in community property settlements, The Defendant also alleged that he was not given the choice as to whether the Defendant should elect to oppose Judge Watts's ruling that he was to pay interest on the community property settlement from date of judicial demand. Furthermore, the Defendant stated that he was ill-advised by the Plaintiff to pre-pay his alimony,
The Defendant alleged the Plaintiff fraudulently generated 2 letters which were introduced into evidence as, Fox 7 dated March 3, 1997 ("Fox 7") and Fox 9 dated March 12, 1997 ("Fox 9"). The Defendant alleged the Plaintiff generated these letters, backdated them and lied about hand delivering them to the Defendant's office. Defendant alleged that these letters were produced as discovery progressed. The Defendant further alleged that when the Plaintiff realized he had a potential malpractice exposure, he fraudulently generated the letters and manufactured a story that he delivered the letters to the Defendant's office to cover up his negligence. The Defendant also averred that the Plaintiff fraudulently charged him for time he did not actually work. The Defendant complained the Plaintiffs bills were replete with errors.. The Defendant claimed he was double billed, billed for the Plaintiffs secretary's time and billed for tithe which in fact the Plaintiff did not work.

FINDINGS OP FACT
On March 6, 1995, the Plaintiff, via an engagement letter, was retained by the Defendant to represent the Defendant in his pending partition proceedings and on certain visitations issues and other actions incidental to his divorce. Prior to the Defendant retaining the Plaintiff, a divorce had been obtained and child custody and support issues had been resolved through prior counsel. Plaintiff represented Defendant for the next twenty-six months. The Fox v. Fox matter was pending in Judge France Watts's Division of The Twenty-Second Judicial District Court. During that period, Judge Waits was terminally ill with cancer.
Mr. D. Douglas Howard, Esq., testified that he was the Defendant's attorney preceding the Plaintiff. Mr. Howard was ordered by the Court to testify. He stated (hat he sent the Defendant an engagement letter regarding his hourly rates, which stated that he began charging at.25 hours, and charged legal interest if payment was overdue. Howard testified that the Defendant accused him of transferring the Defendant's signature on documents which he filed without obtaining the Defendant's approval, Mr. Howard commented that this accusation was outrageous.
Howard stated that he withdrew representation of the Defendant due to the Defendant's express dissatisfaction. Howard stated that he collected his fees after he sent a letter requesting fees pursuant to La. R.S. 9:2781. He further testified that when the Plaintiff commenced his representation of the Defendant, Howard sent the entire file to the Plaintiff and kept a photocopy for himself. He stated that he does not usually withhold correspondence.
At trial, Plaintiff, Defendant and Mary Grace Knapp, Attorney for Defendant's wife, testified that the Domestic case was voluminous and highly contentious. Knapp confirmed Mat there were many emergency orders to which the Plaintiff had to respond. Knapp also testified that she originally felt that Defendant's wile was entitled to $250,000.00 to $300,000.00 as an equalizing payment for the community property partition. Knapp believed Judge Watts ruling ordering the Defendant pay his former wife $109,372.23 plus interest from date of judicial demand fell short of what the Defendant's wife was due. Before accepting Satisfaction of Judgment, Knapp reserved her client's right to appeal. She testified that when Plaintiff brought the check to her office and she requested to reserve her client's right to appeal, the Plaintiff promptly called his client, the Defendant, from Knapp's office, to advise him of the reservation. After the conversation, the Plaintiff complied with her request.
Immediately prior to the Plaintiff's withdrawal, both parties testified that communication between the Plaintiff and Defendant had broken down, and each party was dissatisfied. Consequently, the Plaintiff attempted to withdraw in October, 1996. The Plaintiff was later reinstated because Judge Duczer and Judge Green, both of whom are judges of other divisions, signed the withdrawal orders, and when the order came to the attention of. Judge France Watts (the Judge of the division in which the case was pending), he denied the request to withdraw. On August 12, 1997, the Plaintiff effectively withdrew. Plaintiff testified that he withdrew because among other reasons, he could not get the documents needed for discovery from the Defendant as ordered by Judge Watts.
After Plaintiff effectively withdrew, Mr. Ernest Anderson was retained by he Defendant to handle the remaining matters pending in (lie Defendant's divorce. Mr. Anderson testified that the Plaintiff did not reproduce copies of the correspondence in the Defendant's domestic file. The reasons given was that the Defendant already had the correspondence; and that the correspondence file was voluminous (almost 2500 pages).
Anderson further testified that generally all correspondence was turned over to him when be took over a case; and lie usually turned over all correspondence when he turned a case over to another attorney. The Plaintiff stated that there was a copy center near his office and offered Anderson an opportunity to copy the correspondence, but he declined. Anderson further testified that if the Defendant made an offer to copy the correspondence to him at the time, he did not know why he would decline (lie offer.
Dawn Huvenagel Was employed as a paralegal for the Plaintiff. Huvenagel worked for the Plaintiff after Sharlene Kelley, a legal secretary, terminated her employ with the Plaintiff. Huvenagel testified that she worked for the Plaintiff from May of 1997 through March of 1999. Huvenagel stated that she believed that the Plaintiff billed the Defendant for less than the amount he actually worked on the Defendant's case. Moreover, in direct contradiction to Mr. Anderson's testimony regarding taking the correspondence from the Defendant's file, Huvenagel recalled that Mr. Anderson did not ask for the correspondence. She also stated that they told Mr. Anderson that they would provide copies of the correspondence file. Considering that the testimony of Branton, Huvenagel and Anderson is so contradictory and yet so plausible; the issue of which One is either lying, mistaken or confused is irresolvable. However, with the retention of the Fox v. Fox correspondence comes the first wisp of suspicion, for it creates an opportunity to feather the file later with backdated correspondence.
Sharlene Kelley testified that she worked as Defendant's legal secretary between October. 1996 and May, 1997. She further testified that the Plaintiff instructed her to bill $40.00 per hour for every hour site worked on the Defendant's rile. Site stated that Defendant was billed more frequently and differently from any other client. She stated she was very familiar with the Defendant's file and worked on it on a daily basis. She testified that the trial for partition took one day.
When asked about Fox 7 and Fox 9. Kelley stated with certainty that she had never seen either of the letters, and due to the content of the letters; she would have recalled them. She stated that although it was possible that she did not see the letters, it was not probable. Kelley testified that there was no discussion in the office about advising Defendant to appeal the decision because according to both The Plaintiff and the Defendant, the Defendant had won. Furthermore, there was no discussion in the office of the Defendant's option to appeal or challenge Judge Watts's ruling as to when the tolling of interest on the community property settlement would commence. There was no discussion in the office of a new trial and so another wisp of smoke arises.
Kelley testified that she quit because there was another instance in which the Plaintiff allegedly covered up a mistake. She stated that the Plaintiff allowed client Mark Brecheene's claim to prescribe without filing suit. She further testified that the Plaintiff was going to tell Brecheene that he had withdrawn from the case an earlier date, and the Plaintiff told Kelley that, "this is how you remember it too." She believed that this conversation took place on either May 14 or 15, 1997.
She stated she never saw the evidence labeled Fox 13, which was the Plaintiff's withdrawal letter to Brecheene. In the letter dated April 30, 1997 from Plaintiff to Brecheene. Plaintiff states he withdrew because "you let it slip that the injury sustained by you and your wife did not occur in the auto accident May 12, 1996, but were occasioned by a domestic dispute two or three days earlier" The letter goes on to further state, "You were given the file back on January 9, 1997 and refused to take it or accept certified mail." Kelley stated Brecheene's file box sat in the Plaintiff's office for several months afterward.
The Court notes that Plaintiff did not introduce any evidence of certified mail sent to Mr. Brecheene. One would have expected the original refused and unopened letter accompanied by a return receipt indicating its return after the requisite delays. This lack of evidence that the letters Plaintiff claims to have mailed or deliver create yet another wisp of suspicion.
Kelley further testified that she worked through the middle of May 1997. She stated that she had no contact with the Plaintiff and had no knowledge of this case until she was approached in September 2000 by Mr. Ellis, who is employed by Mr. Draft Ellis came to her house and asked her several questions regarding her employment with the Plaintiff. Kelley subsequently was represented at her deposition by Mr. Philip Boudesque. Mr. Boudesque shares office space with Mites partner, Mr. Frank Tranchina, at their Metairie office.
Kelley was never billed and did not ask whether she owed them a fee for representation. (However, the Court puts little emphasis on this; it is not uncommon for an attorney to arrange counsel for a reluctant witness via professional courtesy.) Kelley remarked that although she was not physically afraid of the Plaintiff,, she stated she feared what he might try to do vis-a-vis retaliatory litigation. The Court took note of her palpable dislike for the Plaintiff.
Mark Brecheene, another former client of the Plaintiff, testified that he never did receive a letter from the Plaintiff stating that he was withdrawing from the case; and that he did not let it slip that he was hurt in anything other than the accident in which he originally stated he was injured. Brecheene stated he was injured May 12, 1996 and was treated by Dr. Galvin. He last saw Dr. Galvin for injuries resulting from this accident on January 9, 1997. Brecheene further testified that he was approached about this ease approximately 6 month's ago. He filed a complaint with the Louisiana Bar Association against the Plaintiff. Brecheene acknowledged that the Bar Association found the complaint to be' a billing dispute.
Dr. Peter Galvin, Mark Brecheene's treating physician and the Plaintiff's CPA, Mr. Sidney Parfait each testified to impeach the testimony of Kelley and Drecheene. Dr. Peter Galvin testified that he last saw Mr. Brecheene on January 9, 1997. Galvin requested Brecheene return cm January 23, 1997, however, he did not return. Galvin stated that Brecheene was not released " and did not know why Brecheene did not return.
Galvin testified that lie received a letter front the Plaintiff dated January 23, 1997, (Fox 12) stating that he would no longer be responsible for Brecheene's bill. This seems to correspond with the time line set out by the Plaintiff regarding the history of his relationship with Mr. Brecheene. Dr. Galvin also testified that his office does not dale stamp their correspondence. It was brought out on cross-exam that the Plaintiff and Dr. Galvin are next door neighbors and arc on cordial terms. However the Court believes that Dr. Galvin testified to nothing less than the complete truth.
The Plaintiff testified that the Brecheene matter prescribed May 12, 1997. Plaintiff's CPA, Mr. Sidney Parfait, testified that the Plaintiff's payroll records show that Kelley's last pay period ended on May 7, 1997. Dawn Huvenagle took over, her first pay period ending May 15, 1997. Plaintiff further testified that Kelley terminated her employment with Plaintiff before Brecheene's case prescribed ants, there would he no reason to make such a statement to Kelley..
The Plaintiff further testified that Kelley was not privy to all conversations and information exchanged between the Plaintiff and the Defendant, which Kelley acknowledged. The Plaintiff states that he did not tell Kelley to charge the Defendant, $10.00 per hour for every hour she worked on his case. The Plaintiff says he did not realize that Kelley was putting her time on the bill. He further stated that he did not realize this until recently, upon Mr. Wyley's (Plaintiff's attorney for the malpractice portion of his suit) request to review his bills, and subsequent to Mr. Lowe's deposition December 5, 2000. The Plaintiff further testified that he typed, billed and delivered some of the correspondence himself.
Testimony was taken from Melo B. Nix, CPA for the Defendant, to ascertain the reason for the discrepancies in the time she charged for meetings with the Plaintiff, as compared with the time the Plaintiff charged for the same meetings. Additionally, she testified to charges reflected in the Plaintiff's bill for meetings with Nix in which Nix shows no meeting or charge. Specifically, the Plaintiff's billing records reflect a four hour charge for a meeting on October 1996 for a meeting with Nix, Knapp and Defendant's CPA. Nix did not recall the meeting or bill for any such meeting. Moreover, she does not recall the Plaintiff showing up at her office for such a meeting. The Plaintiff testified that this charge was a mistake and deducted it from his bill while on the witness stand.
Additionally, the Plaintiff charged the Defendant for a 7.5 hour meeting with Nix on October 25, 1996. Nix testified that she has no charge for that day and no recollection of any such meeting. Nix further testified that she bills for anything 15 minutes or over and she is fairly accurate at billing. She testified that Plaintiff's bill could reflect more time than her own bills on their meetings because the Plaintiff came to her office in New Orleans, and due to traffic, a one way trip could take an hour.
The Plaintiff testified on dross examination that only upon recent review, per Mr. Wyley's request, and subsequent to Mr. Lowe's deposition he did in fact find duplicate charges in his bills as well as time entries and charges for time Ms. Kelley's worked on the file. This is over three years miler suit was filed, As a result, he reduced his original demand through testimony at trial from $12,585.74 to $9,057.94, Plaintiff testified that he billed for a minimum of .25 hours of work. The Plaintiff did not inform the client of such, His engagement letter did state that he billed $150.00 per hour for his time, 30 cents per mile, 25 cents for copies and faxes AL $1.00 per page.
The Plaintiff testified that he: did not charge the Defendant for travel to Covington to do work for other clients as was alleged. There were days when the Plaintiff came to Covington in the morning for one client and went hack to Slidell only to find out that there were sonic new issues generated by the Defendant's counsel, upon which lie lied to act that afternoon. Therefore, he would return to Covington. Some of these double trips to Covington were evidenced in the minute entries dated and stamped at the Clerk a Court's office. Additionally, the Plaintiff testified that there were days that he had to make two trips a day to Covington because he could not find what he needed the first time. Furthermore, the Plaintiff says his bills reflect charges in which he under billed the Defendant. The Court finds on the issue of double billing the Defendant along with other clients, that the Defendant has failed to meet his burden of proof.
Frank Tranchina was originally hired by the Defendants to testily as an expert witness. Subsequently, Tranchina became the law partner of Defendant's attorney, William lintel. Tranchina testified that the Plaintiff approached him at a CLE meeting at which Tranchina was lecturing. The Plaintiff asked Mr. Tranchina about judicial interest. Tranchina told the Plaintiff that he could not talk about it with the Plaintiff because he thought he would be retained by Mr. Dutel on the Defendant's case. The Defendant introduced into evidence two letters, Fox 10, dated September 28, 1998 and Fox 11 dated October 9, 1998, which the Plaintiff allegedly sent to Mr. Tranchina. The letters seem to hint that the Plaintiff had a long talk regarding when interest was due on community partitions. When shown the letters, Mr. Tranchina testified that he received the first letter attached to the second letter. The Court allowed Tranchina and Brecheene to testify because it may he relevant pursuant to La. Code Evid. art. 406 as habit evidence for the Plaintiff's propensity to cover his files with backdated letters; and therefore, specific instances of such are admissible.
The heart of the malpractice claim centers around whether the Plaintiff wrote Fox 7, dated March 3, 1997, and Fox 9, dated March 13, 1997. Fox 7 and Fox 9 were allegedly written to confirm counseling the Defendant of his legal options regarding interest on community property, and specifically, whether to pay interest on the community property, and the prepayment of alimony. Plaintiff argues that he personally delivered the letters to the Defendant's office, both times to an unknown staff member. Defendant argues that he did not receive those letters and he further accuses the defendant of backdating the letters to cover up his mistake. The Court is perplexed that given the rapidly decreasing relationship between the Plaintiff and the Defendant, that the plaintiff chose to hand deliver Fox 7 and Fox 9 to the Defendant's office when lie could have better protected himself by sending the letters via certified mail: or at least requiring the Defendant's office staff to sign for them and so another wisp of smoke arises.
Conversely, the Defendant admitted in testimony that he stored the paperwork pertaining to his divorce in various areas including Ids jeep, his office and in a cupboard at his home. In Defendant's deposition, he contends that he could have thrown some of the letters away. However, at trial, he recanted his previous testimony, slating he Would not have thrown the letters away. The Court noted that such a filing system is prone to errors. The Court further notes that the Defendant's testimony is suspect.
Mr. Edmond T. Wegener testified for the Plaintiff as an expert in domestic relations law; Mr. Michael J. Rice, an expert certified tax lawyer in Louisiana testified for the Defendant; Dr. Roger Burford, an expert economist testified for the Defendant; Mr. Jim Fisher, an expert computer programmer testified for the Plaintiff; Mr. Sidney Parfait, an expert CPA testified for the Plaintiff and Mr. Robert Lowe, an expert in domestic relations law testified for the Defendant.
Mr. Edmond T Wegener testified that he is a board certified domestic law expert practicing in St. Tammany Parish. He has practiced law for 30 years. He testified that he had "no problems" with the Plaintiffs engagement letter. He testified that duplication and billing errors occur; and that a sophisticated client like the Defendant would contact his attorney regarding such discrepancies. Wegener stated that Plaintiffs travel to Covington was reasonable.
Wegener further explained that filings with the Clerk of Court Annex in Slidell were fine given there were no problems. However if the matter required speaking with a judge, then the attorney needed to travel to Covington. Additionally, Wegener testified that he was aware of the case, and in light of its contentious nature, the Plaintiff's bill was not unreasonable. He saw no padding and believed that charging at .25 hours was not an improper billing inurement.
Attorney, Robert Lowe, testified for the Defendant as an expert in domestic relations law. He stated that in his opinion the Plaintiffs bill was problematic. He testified that he reviewed the bill and there were charges for $40.00 per hour and charges for $150.00 per hour. He stated that the accuracy of the billing is the attorney's responsibility. Additionally, he testified that he believed that Plaintiff charged an excessive amount of hours (135) for what turned out to be a one day trial. Furthermore, the issues in the case were not complicated.
Moreover, Lowe believed that sonic of the time that the Plaintiff charged for travel and investigation could have been done over the phone. He believed that there were charges for meetings with Melo Nix that were problematic. Lowe stated that he relied on Accountants and Appraisers for his information and implied that it was more efficient and cost effective for the attorney to get the support the case required from such professionals. Mr. Lowe stated that he rarely filed pleadings himself. Lowe also stated that it is sometimes more cost effective to allow the client to ascertain information himself, rather than have the attorney collecting the information and; therefore, charging the client for his time. Nevertheless, Lowe would not contend that the Plaintiff's bill was excessive overall.
Considering the testimony of both the Court finds that it is the attorney's responsibility to make sure the bill is accurate and cost effective. The Court finds that driving to a dealership to ascertain the book value of the Defendant's jeep is preposterous. A simple phone call to the or purchase of N.A.D.A. book is all that is required,
When examined about whether the interest on the community property settlement should be at date of judicial demand or date of judgement he said he believed that at the time the circuits were in conflict; but lie believed that the jurisprudence in the First Circuit dictated that the interest should run from the date of judicial demand, In any case, because there was a conflict in the circuits, Lowe testified that the attorney's role was .to advocate for his client and argue the conflict in his client's favor. Lowe testified that he makes recommendations to his clients based on his appreciation of the law so that the clients tan make an informed choice.
Lowe agreed that by getting the Satisfaction of Judgment signed, the judicial mortgage was cleared front the public records and the accrual of interest on the judgment stopped. Additionally, Lowe stated that a Satisfaction of Judgment was rare in domestic cases, but he surmised that the Plaintiff felt that because he obtained such a good result, the Plaintiff wanted to put the case to sleep. However, Lowe believed that by allowing the opposing attorney the chance to appeal the Plaintiff only cleared the money judgment.
Mr. Michael J. Rice, expert certified tax attorney testified as an agent to the Defendant's tax consequences resulting from the Plaintiff's alleged advice. He stated that taking a deduction for prepaying alimony was not correct advice because it is not allowed. If IRS detected a prepayment of alimony deduction, tile taxpayer would incur tax and penalty consequences. However, Rice testified that because the IRS did not detect this deduction and the time had passed for the IRS to audit the return for such, the Defendant had "won the tax lottery" and secured a $60,000.00 deduction for 1995.
Dr. Roger Burford, an expert economist, testified as an expert for the Defendant to calculate damages for loss of use of funds lie attributes to interest paid in error on the community partition from date of demand and for prepayment of alimony. He testified that his method of calculation for the loss of use of funds was analogous to the amortization of a mortgage. Had the Defendant not paid the $30,250.00, invested the money and paid alimony monthly he would have earned interest on a decreasing principle. He also calculated the interest had the Defendant not paid $28,000.00 in interest from the date of judicial demand. Because the Defendant invested in Vanguard accounts Burford used those interest rates from the years in which the Defendant could have invested and came to the conclusion that the Plaintiff lost $53,539.00 since 1995 to date.
Burford further testified that he had never spoken with the Defendant about his investment habits and admitted that to get a high rate of return, the Defendant would have to put the money in a fund in which he could not make monthly withdrawals. If the Defendant was limited to this amount from which to pay his alimony, he would likely have the money in a checking account and his money would have earned no interest. Burford further admitted that the market is very volatile right now. The Defendant could have also invested in Treasury bonds for 4-6% interest rate. In the final analysis, Mr. Burford's assessment was that the Defendant suffered a loss of an opportunity to invest.

ISSUES PRESENTED
The issues presented are I.) whether the Defendant (Plaintiff in Reconventional Demand ) in fact owed the Plaintiff the balance of the open account; 2.) whether the Plaintiff (Defendant in Reconventional Demand) committed malpractice by not properly advising his client of the conflict in the circuits regarding whether interest on community property is due from date at' judicial demand or date of judgment, and therefore; I) Whether to seek a new trial or appeal or object Judge `Watts's ruling that Defendant pay from date of judicial demand; 4.) whether the original Plaintiff (Defendant in Reconventional Demand) fraudulently overcharged the Defendant attorney fees for time"and fraudulently generated backdated letters and lied when he stated that he hand delivered the letters to the Defendant's office to cover his alleged negligent handling of the Defendant's case; and 5.) Whether the Defendant (Plaintiff in Reconvention) suffered damage as a result of fraud or malpractice.

LAW AND ANALYSIS
The Defendant in Reconvention's Motion for Involuntary Dismissal of fraud and malpractice was taken under advisement. The Motion is denied.

Malpractice
In October of 1999, the Louisiana Supreme Court held that interest on Community Property Settlements was due front the date of judgment. Reinhardt v. Reinhardt, 748 So.2d 423 (La. 1999). Prior to the Reinhardt decision, the Supreme Court held in the Abraham case that interest for an accounting and settlement of the community began tolling at date of judicial demand. Abraham v. Abraham, 98 So.2d 197 (La. 1957).
In 1992, the First Circuit held in Michael v. Michael, that interest was owed only from date of judgment of partition. Michael v. Michael, 606 So.2d 1099, 1102 (La. App. 1st Cir. 1992). The Court's reasoning was analogous to the Vice decision. In Vice. v. Vice, 567 So.2d 774 (La. App. 3rd Cir. 1990), the Court based the denial of the prejudgment interest on the lack of any proof of fraud or mismanagement as would give rise to the prejudgment interest under LSA 13:4203. Michael, 606 So.2d at 1102. The Court explained that it was aware of the disparate holding in Oliver v. Oliver, 561 So.2d 908 (La. App. 2nd Cir. 1990), but choose to follow Vice because "under the facts of the present ease this is not a delictual action." Michael, 606 So.2d at 1102.
Conversely, in 1993 the First Circuit reasoned in the Theriot case that, "although the instant case is an action for bud, the obligation to pay damages stems from the former obligation to transfer to the spouse of her share of the value of the Community, it is only logical that the amount of damages should run from date of the community property settlement." Theriot y, Theriot, 622 So.2d 257, 264. (La. App. 1st Cir. 1993). Unquestionably, there was a conflict in the circuits when the Defendant's community property partition was pending.
A claim for legal malpractice is stated when the Plaintiff alleges there was an attorney client relationship, the attorney was guilty of negligence or professional impropriety in his relationship with the client, and the attorney's .misconduct causes the client some loss. The proper method of determining whether an attorney's malpractice was the cause in fact of damage to his client is whether the performance of the act would have prevented the damage. Prestage v. Clark, 723 So.2d 1086, 1091 (La. App. 1st Cir. 1998).
The mere breach of professional duty causing only nominal damages, speculative harm, or the threat of future harm-not yet realized-does not suffice to delictual action, Until a client suffers appreciable harm as-ft consequence of his attorney's negligence, the client cannot establish a cause of action for malpractice. Any appreciable or actual harm . flowing from the attorney's negligent conduct establishes a cause of action upon which a client may sue. M.A. Brand Jr., et al, v. New England Insurance Co., et al, 576 So.2d 466, 468 (La. 1991).
When considering the issue of damages regarding lost profits, the proper measure of lost profits is net loss. Louisiana Smoked Products Inc., v. Savoie Sausage and Food Products Inc., 673 So.2d 248, 253 (La. App. 3rd Cir. 1996). While lost profits may not always be susceptible of proof to a mathematical certainty, the lost profits must nonetheless be proven to a reasonable certainty. Id.
By applying the method to determine legal malpractice set out in Preston, the Court finds that an attorney client relationship existed between the Plaintiff and the Defendant. Thus, the first requirement of Prestage is met. However, the controversy as to whether or not the Plaintiff was guilty of a professional impropriety because he failed to adequately advise the Defendant basically boils down to Plaintiff's word against the Defendant's word.
Judge Watts instructed the Defendant to pay interest from the date of judicial demand. Both parties agreed that they believed they-had "won" pursuant to Watts order for the Defendant to pay his wife $109,372.23 to settle the community property dispute. Mary Grace Knapp, the attorney for the Defendant's wife, demanded, $250,000.00-$300,000.00. Had the Plaintiff appealed Judge Watts decision including prejudgment interest, the settlement amount (with which the Defendant admits he was satisfied) may have been disturbed to his detriment. Judge Watts, just 2 months prior to Fox v. Fox, heard the Hertzac v. Hertzac case and awarded interest from the date of judgment. Apparently, Judge Watts used the conflict in the circuits as a signal that he had discretion to award pre or post judgment interest as he saw fit under the circumstance. Whether or not the Defendant was advised of the split in the circuits is an irresolvable issue.
However, assuming arguendo, that if the Plaintiff did not in fact properly advise the Defendant regarding the conflict in the circuits as to when interest on a community property partition is due, he would be guilty of professional impropriety. Similarly, if the Plaintiff gave the Defendant improper advise on prepayment of alimony, the Plaintiff is guilty of professional impropriety. Thus, the second requirement of Prestage is met. However, the Court does not find that the Plaintiff's alleged misconduct (writing and backdating Fox 7 and Fox 9) caused the Defendant any damage if there is no damage the alleged misconduct would be irrelevant:
The Defendant stands to obtain a credit for the pre judgment interest he paid under the Reinhardt decision. Additionally, according to the Defendant's own tax expert, the Defendant was not penalized and would not be penalized for prepayment of alimony while simultaneously taking a $60,000.00 deduction and so he has failed to suffer any damages. Therefore, because the Court finds that the third requirement of Prestage is not met, It finds that the Plaintiff committed no malpractice in his alleged failure to advise..
Moreover, the Plaintiff correctly argues that a lawyer who undertakes to render advice on an unsettled proposition of law is held to know what a reasonably prudent lawyer should know but is not held to a standard of perfection, Smith v. St. Paul Fire & Marine Insurance Co., 344 F. Supp. 555 (N.D. La. 1972) aff'd 500 F.2d 1131 (5th Cir. 1974). Thus, an attorney should not be held liable for an error of judgment when the judiciary itself is in disagreement over the sante issue. Alternatively, by applying the Brand Court's analysis for malpractice, assuming arguendo that the Plaintiff breached his professional duty, the Court does not find that the Plaintiff suffered any nominal damages, speculative harm, or the threat of harm not yet realized as a consequence of the Plaintiff's alleged negligence.
Finally, on August 31, 1999, the Court maintained that the malpractice claim for the prepayment of alimony had prescribed. Nevertheless, the Court allowed testimony regarding the potential damages; in this case, further proof of the Defendant's lack of damages. In any ease, the testimony of Mr. Rice indicates that although the Plaintiff may have given incorrect advice on prepayment of alimony, the Defendant experienced only positive lax consequences and the statute of limitations had run for the IRS to penalized the Defendant. Indelibly, the Court finds that Mr. Burford's calculations on loss of an opportunity to invest cannot be proven to a reasonable certainty, as required in Louisiana Smoked Products Inc.
There was no evidence presented to the Court that the Defendant could afford to invest these funds into a long term investment account. The funds were likely needed to pay alimony each month and would have been deposited in a checking account that earned no interest. Thus, the Court finds the Defendant suffered no nominal damages, speculative harm or threat of future harm that has not yet been realized for the Plaintiff's actions or inactions.

Fraud
Fraud is misrepresentation or suppression of the truth made with the intention to either to obtain unjust advantage for one party or to cause a loss or inconvenience, to another party. Fraud must be proven by a preponderance of the evidence that must be plead with particularity. La. Code Civ. art. 1957; La. Code of Civ. P. Art 856. "Intent to defraud and loss or damage arc two essential elements to constitute legal fraud." McDonough Marine Service v. Ronald Doucet, 694 So.2d 305, 309 (La. App. 1st Cir. 1996). Fraud may be established by circumstantial evidence. Id.
Given the Court's diligent attentiveness to all testimony, It is hard pressed to state with certainty that It believes the Plaintiff, It is equally hard pressed to find that the Defendant proved by a preponderance that the Plaintiff did in fact fraudulently generate letters, Fox 7 and Fox 9, to the Defendant, Fox 10 and Fox 11 to Mr. Tranchina and Fox 12 and Fox 13 to Mr. Brechecnc. The Plaintiff has no explanation as to why Mr. Brecheene and Mr. Tranchitia do not recall or did not receive the correspondence he sent to them, The Court is equally hard pressed to find that the Defendant met his burden of proof that the Plaintiff intentionally and fraudulently billed the Defendant.
Similarly, the Defendant has not met his burden of proving that he has suffered any damage. Undoubtedly, the Plaintiff's bilk were confusing and replete with errors. The Court took note of the Plaintiff's testimony regarding his billing practices and is repulsed by the Plaintiff's lackadaisical attitude toward billing and lack of responsibility for such a critical aspect of the practice of law.
The conflicting testimony essentially boils down to one witness's word against the other's. Although there is definitely smoke, the Court cannot quite see the fire. Kelley. Brecheene and Tranchina testified to impeach the character of the Plaintiff for his propensity to intentionally cover up his malpractice by generating back dated letters. It seems that the Plaintiff has a high rate of correspondence which is never received, although it seems he always has some sort of plausible explanation, The Court is hard pressed to say this is not coincidence. Is the Plaintiff a victim of circumstance or is he so egotistically that he must lie to cover up for his mistakes? Although the Court has its suspicions, It cannot say that the burden of proof is met.
After Dr. Galvin and Mr. Parfait and the Plaintiff testified, the credibility of Brecheene and Kelley was damaged. The Court notes that Kelley generally appeared very credible. The Court considered her a reluctant Witness insofar as her fear of retaliatory litigation instigated by the Plaintiff in exchange for her testimony.
However the Court is troubled by what may be a critical lack of perception on her part. Ms. Kelley, whose dislike for the Plaintiff was apparent, terminated her employment with the Plaintiff 5 days before Mr. Brecheene's suit was due to prescribe according to Mr. Parfait's records; leaving the question open as to why the Plaintiff would tell Kelley the Brecheene suit had prescribed when in fact it had not. Kelley's testimony would leave the Court to conclude that possibly Branton is so arrogant that he intended in"advance to allow Brecheene's suit to prescribe, and manufactured and backdated timely notice to Brecheene.
Additionally, even though it is Kelley's word against the Plaintiffs as to whether the Plaintiff told Kelley to charge the Defendant for the lime she worked on the Defendant's file, it was the Plaintiff's responsibility to review his billing statements. Nonetheless, Mr. Brecheene's credibility was damaged when Dr. Galvin testified that Brecheene did not return to Dr. Galvin " January 23, 1997, which was along the same time line that the Plaintiff testified that he would no longer represent Mr. Brecheene, and of which he apprised Dr. Galvin by letter.
The Court would also point out that the credibility of the Defendant was also put at issue. It appears that from testimony of the Plaintiff and Mr. Howard, that the Defendant may have a propensity for hiring attorneys and accusing them of misconduct, and then requiring his attorneys to resort to sending letters threatening to sue because they have not been timely paid. The Defendant also conveniently changes his prior deposition testimony dramatically to suit his purposes.
With regard to the billing, the Plaintiff testified as to the reasons for discrepancies in time billed for between his bills and those of Melo Nix. He attributes the difference to travel time. However, there was a charge for a meeting on October 11, 1996, which the Plaintiff states he thought was scheduled, but according to Ms Nix's bill or recollection, the meeting did not lake place. The Plaintiff explained that his secretary scheduled the meeting with Nix. Knapp. and Mrs. Pox's CPA, and when he got to Nix's office, there was some mistake and no meeting took place. A client should not be billed for even an honest mistake.
The Court noted that when Mary Grace Knapp testified, no one questioned her regarding her recollection of such a meeting. The Plaintiff subsequently subtracted the October 25, 1996 charge for 7.5 hours from his bill when it was brought to his attention that Nix did not have a corresponding entry in her billing records. The Court finds that the ultimate issue of who is telling the truth is irresolvable.
All of the wisps of smoke create the image of a large fire somewhere, but again the Court cannot quite see the Paine. In other words, this case is so close as to be a tie. Even though the Court feels there is a ossibility thaft he Plaintiff did backdate the letters, Fox 7 and Fox 9, that he lied under oath, and that he seems to be in the habit of doing so on a regular basis, the Court is loath to end the career of an attorney with findings of fraud when there remains a reasonable plausibility that it is all coincidence; and also when the Court has equal misgivings about the credibility of the Defendant.
However, pursuant to La. Code Civ. P. art. 862. the Court finds implied in the pleadings that as the Defendant's attorney, the Plaintiff acted as a mandatary for the Defendant. A mandate is a contract by which a person, the principal, confers authority another person, the mandatary, to transact one or more affairs for the principal. La. Civ. Code art. 2989. The mandatary is bound to fulfill with prudence and diligence the mandate he has accepted. La. Civ. Code art. 3001. He is responsible for the loss that the principal sustains as a result of the mandatary's failure to perform. Id.
The Court finds that when the Plaintiff became the Defendant's attorney, the Plaintiff became the Defendant's mandatary, and as such owed the Defendant a prudent and diligent representation. Prudent and diligent billing is an imperative part of that representation; especially when the mandatary is representing the principal as his attorney. Because the Plaintiff overbilled, erroneously billed, allowed another employee to charge the time she worked on the Defendant's file to the Defendant, and charged the Defendant at a billing increment that was not contracted, the Court finds that the Plaintiff failed to prudently and diligently represent his client.
Furthermore, the Plaintiffs imprudent billing practices has put his entire bill in question . Charging the Defendant for a trip to a car dealership to attain the fair market value of the Defendant's jeep is just one example of lack of diligence and prudence in using his time and the Defendant's money efficiently. The Plaintiffs bill is so convoluted with errors that the only fair and equitable thing to do is to relieve the Defendant of the entire bill. Because the Plaintiff has failed to prudently maintain his billing records thus putting his entire bill in question and has breached his duties as mandatary, the Court hearby relinquishes the Plaintiffs entire bill.

CONCLUSION
The Court finds that the Defendant has not met the burden of proof for either malpractice or fraud. However, the Court does find that the Plaintiff breached his duties as a mandatory to represent his principal prudently and diligently by presenting the Defendant with such a . convoluted bill . Therefore, the Court hearby relinquishes the remainder of the debt Plaintiff claims the Defendant owes. Additionally, the Court finds and orders that the Plaintiff pay the Defendant for the pro-rata portion for attorney fees and court costs for defending the Plaintiff's original petition, A reasonable amount of attorney's fees and costs will be determined at a subsequent hearing.

RECAPITULATION
The Court finds that the Defendant has failed to meet his burden of proof for malpractice and fraud. However, pursuant to La. C.C.P. Art. 862, the Court finds that the Plaintiff is a mandatory for the Defendant and as such breached his duties to the Defendant by his imprudent billing practices. The Court therefore relinquishes the remainder of the debt the Plaintiff claims the Defendant owes and orders that the Plaintiff pay the Defendant for the pro-rata portion of attorney's fees and court costs for defending the Plaintiffs original petition. A reasonable amount of attorney's fees and costs will be determined at a subsequent hearing.
These Reasons are assigned to the Judgement of this Court rendered on this date, in connection herewith.
McCLENDON, J., concurs, and assigns reasons.
Based on the evidence presented, I must concur.
NOTES
[1] Branton represented himself on his suit on open account against Dr. Fox and on the portion of Dr. Fox's reconventional demand alleging fraud. The Phelps Dunbar firm represented him and his professional liability insurance carrier, The Coregis Group, on the portion of Dr. Fox's reconventional demand alleging legal malpractice.
[2] There were actually two judgments. The first one, dated January 26, 2001, dismissed Dr. Fox's legal malpractice and fraud claims, but ordered Branton to pay Dr. Fox a pro-rated portion of attorney fees for having to defend Branton's suit on open account; the amount of attorney fees was to be determined at a later hearing. After this court denied writs and dismissed the subsequent appeal because the judgment was not final, a hearing was held by the trial court. The attorney fees were awarded to Dr. Fox in a judgment dated June 23, 2005, which finalized the unresolved portion of the first judgment. In this opinion, we will refer to these two judgments as "the judgment" unless otherwise specified.
[3] In a judgment signed on August 31, 1999, the trial court maintained an exception raising the objection of prescription to this claim, and the claim was dismissed.
[4] Article 2989 defines a mandate as "a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal."
[5] Article 3001 states that the "mandatary is bound to fulfill with prudence and diligence the mandate he has accepted. He is responsible to the principal for the loss that the principal sustains as a result of the mandatary's failure to perform."
[6] We note also that Branton identified work for which he did not bill Dr. Fox, including a 121-page deposition at the office of the attorney representing Dr. Fox's ex-wife that did not appear on any of his bills.